## W. E. BURT v. THE STATE.

No. 1581. Decided June 9, 1897.

Motion for Rehearing Decided December 2, 1897.

**1. Evidence—Insanity—Expert Witnesses—Hypothetical Case—Rule as to.**

On the trial of an issue of insanity in a criminal case, the rules of procedure in the examination of medical experts is, that counsel may embrace, in hypothetical questions, such facts as he may deem established by the evidence, and if opposing counsel does not think all the facts established are included in such questions, he may include them in questions propounded on cross-examination. The facts embraced in the hypothetical question may assume the existence of any state of facts which the evidence fairly tends to justify. And it seems that such question is not improper because it includes only a part of the facts in evidence. Where the expert has not heard the evidence, each side has the right to the opinion from the witness upon any hypothesis reasonably consistent with the evidence; and if meagerly presented in the examination on the one side, it may be fully presented by the other, the whole examination being within the control of the court, whose duty it is to see that it is fairly and reasonably conducted. See infra paragraphs 18, 19, 21, and 22.

**2. Same.**

On a trial for murder, where the counsel for the State submitted a hypothetical case upon which the medical expert gave his opinion that defendant was sane, whereupon said counsel submitted a case based upon all of the evidence, to which the expert answered, that in his opinion defendant was sane; and defendant's counsel then submitted his hypothetical case, upon which the expert gave it as his opinion that defendant was insane; Held, that the contention of defendant, that no opinion of the expert upon the first case stated by the prosecution was legitimate, and that no opinion of the expert was legitimate or admissible until a full case had been submitted; and that the admission of the opinion, as to the first supposed case, was error for which the judgment should be reversed, is not maintainable under the circumstances shown, because a case based upon all the evidence was afterwards, in fact, presented to the expert by counsel for the defendant as well as counsel for the State.

**3. Admission of Evidence Not in Rebuttal—Practice.**

The court has discretion to receive evidence until the argument is concluded, whether in rebuttal or not.

**4. Nonexpert Opinion as to Defendant's Sanity.**

On a trial for murder, the nonexpert opinion of a witness as to defendant's sanity at a particular time, based upon a business transaction he had with defendant a few days prior to the homicide, is admissible where the witness detailed at length the facts transpiring at that time upon which he based his opinion.

**5. Judge's Explanation to Bill of Exceptions—Practice on Appeal.**

On appeal the court is not required to consult the statement of facts to verify the judge's statements in his explanation to a bill of exceptions.

**6. Insanity—Use of Medical Books.**

On an issue of insanity, medical books can not be introduced in evidence, nor can an expert witness be permitted to testify as to statements made therein; and it is clearly inadmissible to permit the reading of such book or excerpts from standard books of that character by counsel in explanation or elaboration of his argument.

**7. Simulating Insanity on the Trial—Expert Opinion.**

On a trial for murder, where evidence had been introduced in behalf of defendant of his manner, appearance, and demeanor during the trial as evidence of insanity at that time, it was clearly competent to permit a medical expert to testify that the defendant was simulating, where the witness, in addition to being an expert, testified that he had carefully observed the defendant and his demeanor during the trial, which had lasted about seven days.

**8. Same.**

Where defendant had offered in evidence his appearance and manner of coming in and going out of the courtroom, it was not error, upon the question as to whether or not he was simulating insanity, to permit a witness to testify that defendant had struck his head against a window frame as he passed through the window the day before, and that it was the only time he had done so in the many times he had passed through said window during the trial.

**9. Insanity—Who Is an Expert.**

A minister of the gospel, who has read some authors upon moral and intellectual science, but nothing upon insanity or medical jurisprudence, is not an expert nor qualified to give an opinion as an expert upon the sanity or insanity of a defendant.

**10. Same—Expert Opinion Based Upon the Conduct of an Unwarned Prisoner.**

An expert may base his opinion of the sanity or insanity of a defendant based upon the actions and conduct of defendant while in jail and although defendant was unwarned.

**11. Same—Nonexpert Opinion when Prisoner Was Warned.**

Where the sheriff having the defendant in his custody has warned him, anything the defendant stated to him is admissible in evidence, and the sheriff may give his opinion of the sanity of the defendant, based upon his conversations with defendant, and facts, acts, and observations of and concerning the defendant.

**12. Murder in the First Degree—Charge of Court—Disregard of Human Life.**

On a trial for murder, where the evidence showed that defendant had killed his wife and two little children, it was the duty of the court, in defining murder in the first degree, to instruct the jury, as was done: "Do the facts and circumstances in this case show such a reckless disregard of human life as necessarily includes a formed design against the life of the person slain? If they do, the killing, if it amounts to murder, would be upon express malice."

**13. Murder—Indictment—Allegation as to Different Means Used.**

Where there is doubt about how the death was produced, it is well to put every means suggested by proof in the indictment, and, if proof be made of any one of the means alleged, it is unnecessary to prove them all.

**14. Same—Murder in the Second Degree—Charge—Practice.**

On a trial for murder, it is the proper, prudent, and safe practice to submit in the charge to the jury the issue and law of murder in the second degree.

**15. Insanity—Burden 'of Proof.**

On an issue of insanity, the burden of proof is on the defendant, though he is not required to prove it beyond a reasonable doubt.

**16. Murder—Enormity. of Act—Fair and Impartial Trial.**

On a trial for murder, notwithstanding the enormity of the act imputed to defendant, he is entitled to a fair and impartial trial, and if he has not had such trial, the judgment of conviction should be reversed.

ON MOTION FOR REHEARING.

**17. Insanity—Medical Expert—Hypothetical Case.**

On the issue of insanity, the State can formulate a hypothetical case embracing such facts bearing upon the question of sanity as it deems proper and competent, and obtain the opinion of an expert. If the defendant is not satisfied with the case submitted by the State, he has the privilege of submitting his case not only as embraced in his testimony, but upon any and all testimony introduced on the trial; and if he is denied this right the error would be patent.

**18. Same.**

In stating a hypothetical case to an expert witness, the State is not bound to include all the testimony bearing upon the question of sanity in order to obtain a legal and proper answer from the expert. The State has the right to submit its hypothetical case, and, if the accused is not satisfied with it, he can state his hypothetical case. See opinion for a review of authorities and a discussion in extenso of the question.

**19. Murder—Evidence—Exclamation of Deceased.**

On a trial for murder, where it is conceded that defendant killed his wife and two children, at their home, during the night, it is competent to prove by a witness, that about 7 o'clock of the evening before the killing, as she was passing the house she heard a woman's voice, pitched high, in the house, saying: "I am not going to stand this thing any longer;" the·other evidence tending to show that at the time defendant and his wife were alone in the house.

**20. Murder in the First Degree—Charge.**

On a trial for murder, where the charge of the court gave a remarkably clear and explicit definition of murder in the first degree, and afterwards, in the application submitting the law applicable to the facts constituting murder in the first degree, added the following, which was separated from the context by a semicolon, to-wit: "Or, if the said defendant did, with malice aforethought, so kill the said Anna M. Burt, you will find the defendant guilty of murder in the first degree;" and it was contended, by counsel for appellant, that this particular excerpt from the charge expressly authorized defendant's conviction of murder in the first degree upon "malice aforethought," which could not constitute murder in the first, but murder in the second degree, murder in the first degree being predicable only upon "express malice;" Held, that the words "so kill," used in this excerpt, of necessity mean, in the manner and condition of mind set forth in the preceding immediate context portion of the charge, and the contention is without merit. Held further, there being no exception reserved to the charge mentioned, and there being no controversy as to the fact of the killing by defendant, no possible injury could have resulted to defendant even had the charge been erroneous.

**21. Hypothetical Case—Practice.**

If one side fails to include all the testimony in the hypothetical question, the other may go into the matter fully before the jury, and such a practice is commended by the authorities. [Opinion of DAVIDSON, J., concurring in the result.]

**22. Same.**

The true rule on this subject is simply this: When the issue of insanity is gone into and testimony is introduced upon that question, and an expert is introduced by a party and a hypothetical question is propounded by such party to such witness, he should embrace in such hypothetical question all the facts that have been developed

in the evidence bearing upon that issue which are not incongruous, and which are not disputed. If any facts are incongruous or are disputed by him, of course he would be authorized to omit such facts; and on cross-examination the opposite party could, if he saw fit, in addition to the hypothetical question put by the party introducing the witness, propound a hypothetical case of his own and add thereto such other facts as may be omitted by the opposite party which might occur to him to be material. Either party should be authorized to propound hypothetical cases embracing the disputed facts. When all the facts in evidence bearing upon the issue of insanity of the defendant are undisputed, and the expert is adduced by the State to respond to a hypothetical question, that question should, in common fairness, embrace all the facts. [HENDERSON, J., concurring in the result.]

APPEAL from the District Court of Travis. Tried below before Hon. R. E. BROOKS.

Appeal from a conviction for murder in the first degree; penalty, death.

The indictment in this case charged appellant with the murder of Anna M. Burt, his wife, on the 24th day of July, 1896. There were also two other indictments charging him with the murder of his two little girl children, aged 4 and 2 years.

The following statement of the case, which is substantially correct, is taken from appellant's brief:

On the night of the 24th day of July, 1896, the parties deceased disappeared between 9 o'clock and daylight. The appellant was about the house the whole of the next day, had various dealings with divers persons, and then took the train at about 11:40 o'clock p. m., northbound, and was arrested in Chicago in about thirty days.

On the fifth day after the 24th of July the victims were found in the water in an underground cistern in the basement of the house where the family had lived. The body of the wife was wrapped up in a blanket, with a rope wound around it and a handkerchief tied tightly around the neck. There was a wound in the right temple extending down to the cheek bone. Both the skull and cheek bone were crushed. This wound was sufficient to produce death from hemorrhage, and from shock to the brain. The handkerchief could have produced death from strangulation, and there was water sufficient in the cistern to have caused death by drowning. The two little girls had exact counterparts of causes for death. Their hands were crossed on the breast and tied with wire. Their feet were also crossed at the ankles and also tied with wire, and then wire wound along the bodies as if to keep their clothes in place. These bodies were carried from a room upstairs, a distance of at least 100 feet, to the cistern and therein deposited and the top thereto securely fastened by nailing it down. There was no blood found anywhere about the premises at any point.

The affection of accused toward his family was a noted and remarked fact by those who knew them.

All the evidence which sought to connect appellant with the killing was circumstantial.

He was indicted in one count, charging murder of wife, and the killing alleged to have been done in the three modes named—first, by wound-

ing with some cutting instrument; second, by strangulation; third, by drowning.

The trial came on with plea of not guilty entered. The defense was insanity, but no suggestion was made that appellant was insane at the time of the trial. The facts claimed to have been proven by the State will be found infra, in appellant's brief, setting out the hypothetical case propounded to the State's witnesses.

*George S. Walton, E. T. Moore,* and *Walton & Hill,* for appellant.—The court permitted the State to put a hypothetical question to its expert witnesses, based on its own testimony, exclusive of any fact that was proven by the accused. The defendant objected at the time, and perpetuated the objections by bill.

This question was put to the medical witnesses: Suppose the defendant was a married man, with a wife and two children, the children being about 2 and 4 years; that on the night of the 24th of July, 1896, he and his wife were at home at half-past 8 or 9 o'clock, when, by the nurse, the younger child was delivered to him, and the elder to the wife; that after the lapse of a little while, he went to the dining room, filled a bottle with milk for such younger child, then took the younger child in his arms, and with a bottle of milk went upstairs to the room where he and his wife and the children slept, leaving the wife, the elder child, and the servant in the lower rooms; that this was the last ever seen of the younger child alive. After a time, the servant departs and does not return until 11 o'clock. All is quiet in the house at that time. A day of two before this he was seen coming from the stable, with a grass sack in his hand, which contained something. At some hour of the night, in their bed-room, the defendant killed his wife and two children, by striking each of them in the right temple and side of the face with a hatchet, crushing the bones of the face and fracturing the skulls; that he then tightly tied around the throat of each a handkerchief, sufficiently so to produce strangulation and suffocation; then enveloped the body of the wife, except the feet, in a blanket, and wound around the blanket ropes so as to keep the blanket in place and the body enveloped; he ties the hands and feet of the two children with wires and other ligatures, they being in their night clothes. He then conveys the bodies, by some means, in his arms (or by the lowering of them from a window, or through it, casting them out) from the upstairs room to the lower floor, and thence transporting them through a difficult, circuitous route to an underground cistern in the basement of the house, and cast the three bodies therein, and then nailed down the top of the cistern, which had been ripped off to admit the bodies; there was water in the cistern sufficient to submerge the bodies; the water in the cistern was in daily use by the household theretofore. He took the handle off the cistern pump and secreted it. By some means, or care used, not a stain of blood had been left on the floors, on the walls or furniture in the room where the killing was done, nor on the way from

that room, inside or outside of the house, on the way to the cistern. The servant returned at about 11 o'clock, and slept in the house, but heard no noise, except a faint, dream-like remembrance of hearing a child cry. The next morning, about 7 o'clock, he tapped at the servant's door, awakened her, requested her to rise and go to market, a thing she was not in the habit of doing. He was not seen again until the servant returned from market. On her return, she took the teakettle, proposing to fill it with water; and in taking hold of it it made a noise, when the defendant said to her, "Don't use water from the cistern, as a cat fell in there last night." Some questions about the .wife and children arose, when he said that he had had some trouble in the night and had sent them to San Antonio on the 5 o'clock a. m. train, but that they would be back Tuesday or Wednesday, when everything would be ready to go keeping house at the Scott place. His breakfast being prepared, defendant gave a note to the servant, to be carried to a cartman, directing him to go to the store of defendant's brothers and procure and bring to the house some boxes; he also gave her some money to buy some nails and bring to him, all which was done as directed, and the cartman on bringing the boxes was requested to return at 3 or 4 o'clock. He ate his breakfast; he sent the servant with a note to a second-hand furniture man to come and look at the furniture and other household effects. He came and looked at the effects, and asked the price wanted, and was told $150, but finally agreed to take $65, and the trade was consummated at those figures, and the goods delivered. During the day the bloody clothing, sheets, bolsters and pillows, and other blankets, comforts, all more or less bloody, a bloody hatchet, the hats and bonnets of the wife, and miscellaneous clothing of the children (not bloody), bloody cotton from a mattress, portions of the ticking from a mattress, also bloody, were all packed in the packing boxes and nailed up, and at 4 o'clock delivered to the cartman to be conveyed to the transportation office for shipment from a fictitious person to a fictitious person at Houston, Texas. The addresses on the boxes were written in a feigned handwriting by defendant. During the day he had various money transactions with different persons, wrote various notes, tore some up, and others were delivered to the persons to whom written. He was in or about the house the greater part of the day. In the evening the milkman came, whom defendant met at the door and said, "this is the milkman," got a pitcher for milk, and told him the family had moved to 912 Rio Grande Street (there being no such street number), and that the next day he, the milkman, would find in the milk pitcher two tickets instead of one At that time he appeared weary, as if having been hard at work, in shirt sleeves, breathing hard, and face flushed. He packed three valises and put them in the back premises of the next house during the evening. Later in the evening, towards night, he went to a hotel, ate supper; went to a barber shop and was shaved; returned to the hotel and played checkers until towards train time. Did not conceal the fact that he was on the eve of departure; to one he said he was going to Dallas; to another, San Antonio; to another, Georgetown; to another, Dallas or

Fort Worth. At the time named he went to the place where he had deposited his valises, obtained them, and made his way to the depot; remained in, at, and around the depot until the train came in, at about 11:40 p. m. Did not buy a ticket to Chicago; boarded the train, rode on it in a seat with a party whom he knew and who knew him; conversed on different subjects. He was apprehended in Chicago about thirty days thereafter, and extradited for trial, on charge of having murdered his wife and children. At the time of the murder he was out of business, without any ready means; judgment of forcible detainer had been rendered against him for the possession of the house in which he lived; process to oust him was in the hands of an officer, and the 24th of July was the last day he had permission of the owner to remain in the premises. At no time anterior to the said 24th July, nor on that day, nor the day subsequent thereto, did he, to many friends and acquaintances, and those with whom he transacted business, present a demeanor, appearance, habits, or conversation different to what was usual with him.

The objections to this question were these:

1. Because the witness has not heard all the testimony.

2. Because the hypothetical case is partial only, in that it does not embrace all the evidence.

3. It is not a hypothetical question on all the evidence as already let in, nor on all the indisputable evidence.

4. It is not a hypothetical (case) question, based substantially on all the evidence as already in, nor on all the indisputable evidence as already let in.

5. It is a hypothetical case (question) from the standpoint of the State (evidence) alone, out of which is left all the evidence of the defense.

6. No expert, by law, is allowed to answer to a question of sanity or no sanity unless the answer is based on a hearing of all the testimony on one hand, or to a hypothetical case (question) formulated on all the evidence, or at least based substantially on all the evidence before the court and jury, at the time the question is put, which is not pretended to be the case here.

The objections were overruled, and the witness answered, that in his opinion the defendant was sane 24th July, 1896.

This question is settled by the decisions of this court by long-standing, logically reasoned adjudications.

Webb's Case, 9 Texas Criminal Appeals, 490: The court says, after a review of the authorities: "As to medical experts, they may state their own opinions upon the whole evidence if they have heard it all, or upon a hypothetical statement which is in conformity with the whole evidence. All authorities agree that it is inadmissible to permit an expert to give his opinion upon anything short of the whole evidence in the case, whether he has personally heard it or it is stated to him hypothetically." 506.

Leache's Case, 22 Id., 279: There the court, accepting the utterance in the Webb case as the law, and referring to it as such, repeats the language verbatim. 306.

Whatever may be the law elsewhere, the law in Texas is, that expert opinion may not be given save on the whole evidence, and this court says that on this as the law all authorities agree. This is not only the law as laid down in express words by this court, but is founded on reason, common sense, and unqualified necessity in seeking for the truth. To declare the law otherwise is to say that a part is equal to the whole, that to see a part of the thing is to see the whole, and to be part of a recitation is to be the whole. The contra proposition is illogical, a plain absurdity, and an absolute contradiction in terms.

The state of the trial, then, was this: The State had put in its testimony in chief and rested. The defense had put in its testimony and closed. The State, in rebuttal, had introduced its expert witnesses. To them the question was propounded, being a question embracing and involving the evidence of the State only. Before answer, defendant objected for the various reasons stated in the bill, and in doing so based himself on the Webb and Leache cases, before cited, and this branch of the case was tried by defendant having said cases as guides, and followed along the lines pointed out by them. The witnesses answered that in their opinion defendant was sane on the 24th of July, 1896, and at the time of trial. Thus there were fixed in the minds of the jury the opinion of the experts that the defendant was sane, and this opinion, based not on all the evidence, not on one-half, not on two-thirds, but only on the evidence on one side. To further show the want of reason, logic, or justice in the proceeding, a proposition was submitted from the defendant's standpoint alone, and these experts answered that the defendant was insane. Thus it appeared that defendant on the one hand was sane and on the other insane. It was the duty of the expert to reconcile the seemingly conflicting facts, and determine whether, conceding the truth of the facts on the one side and the other, sanity or insanity was incompatible with all the facts, and say whether or not an insane man may not have done all the acts recited in the State's question, or may not an insane man have performed all these things and yet been in that condition from heredity and other causes shown in defendant's behalf?

It is true that the question of the State was not formulated on all the evidence that was admittedly true and incontestible, and that was not contested, and as to which there were no contradictions nor the pretense of any; such as, for instance, that insanity had existed in the defendant's family; the condition of his mother when she bore defendant; his being a congenital moral pervert—a degenerate; the change in his life as he grew older—in manner, habits, association, demeanor, alienation from his only near relatives; his devotion, love, and affection for his wife and children; the barbarous, brutal mode of killing them, and other facts. These facts were absolutely uncontested, and yet while he may have been insane, and do all the acts related in the State's question, the evidences of that insanity are all left off or out of the question, and his condition of mind tested by facts alone, which while of themselves the acts of a sane man, were not inconsistent with what may have been done by an insane person.

Again, the question was not formulated on substantially all the evidence then in nor on all the evidence that was uncontroverted.

If the rule as laid down by this court be not the true one, then the evidence may be divided and subdivided until it is in pieces as many as there are witnesses in the case, or isolated facts and circumstances surrounding a killing and a question founded on each and every varying view of the case.

This was a case dependent wholly on circumstantial evidence as to the killing. In such case the rule is liberal in the admission of testimony that by any reasonable method of connection or combination can throw light on the killing itself or on the motive leading thereto, or the cause therefor, but the testimony must be pertinent in and of itself to make or help to make a chain, which made, points to the accused in some direct manner. Isolated facts which may exist, but having no connection with some other fact or facts which, taken together, intelligently establish another fact, are never admissible in any case.

Such an isolated fact was permitted by the court to go to the jury in this case, over the objection of accused, and which, in its tendencies, was decidedly harmful and prejudicial to him when it from no standpoint was helpful to the jury in coming to a reasonable conclusion as to his guilt or innocence. It came in as evidence in rebuttal. It got in under the guise of being newly discovered. It was this: The witness said that about the hour of 7 p. m. on the supposed night of the killing, and when about opposite the defendant's house, she heard a woman's voice raised in rather a high key say: "I will stand this thing no longer." She did not recognize the voice nor see anybody. She in no way connected the accused or the deceased with the voice. It was not shown who said the words, to whom they were said, nor the occasion for saying them.

The fact was in evidence, however, that the nurse was then out with the two children. The hour was growing dark. The nurse came in about 9 o'clock and found the accused and deceased wife in the sitting room in their usual humor, and noticed nothing out of the common.

The question comes, what office did those words perform on the jury to lead their minds adversely to the accused? The idea presented by their offer by the State was that they were uttered by the wife to the husband, and the occasion for them was because of some outrage being done to her by him, and that this outrage or wrong was of some time standing, or had been repeated time and again; that her patience had been worn out by his outrages and she had rebelled, and that therefore because of her rebellion, and to prevent her from acting in a way to expose him by refusing longer to stand the outrage, he had at a subsequent hour murdered her. The relation between them had ever been one of affection and love, if not absolute devotion itself. In all the testimony there is not one word that suggests or tends to suggest any other relation than that stated. There had been no quarrels, no disaffection, no cross purposes, no jealousy, no wrong, no outrage, naught but a quiet life of peace, happiness and contentment. True, closeness in money matters sometimes existed,

but its absence, so far as mortal eye ever saw, or mortal ear ever heard, made no difference with them. They stood side by side and breasted the storm together. Then we may safely say that there was nothing in the case on which the exclamation could stand as in connection with anything that existed in the then past, and we may with equal safety say that the next two hours are equally barren of fact or circumstance to raise cause to believe the words were in anger, protest, or rebellion by the wife to the husband. At the end of that time the children came in with the nurse, and then all was well as it had ever been theretofore. In a little while the husband takes charge of the younger child, as was his habit, and the nurse undresses the elder for bed. It was a tender and pathetic scene. The husband filling the vessel with milk to meet the hunger of the babe in the night, taking her in his arms, placing her close to his heart, and carrying her to rest and to sleep.

This was the condition when the eyes of earth, outside the little family, closed on the wife and children in life, and only opened again to see their mangled bodies.

If the portrayal by the facts of the scene, the circumstances and surroundings, do not convince the sane mind that the expression we are discussing did not come in as a deadly instrument, out of its place, with no connection with and no legitimate relation to, any of the other facts precedent to or subsequent to its utterance, then we do not understand, appreciate, nor comprehend the relation of one thing to another. This is a link outside the chain, and is wholly incapable of uniting the two ends of the chain that lie away from it and beyond its reach, unless it be arbitrarily thrust in to make a credulous and willing jury believe there is a chain where there is no chain.

It is claimed that other testimony was improperly admitted, viz., that of R. A. Rutherford, his wife and others, in behalf of the State, over the objections of accused. The objections may be summarized in this, that witnesses were examined as laymen as to the sanity of defendant. The objection was that they did not qualify themselves to speak on the subject. In the case of many of these witnesses their opinions were based on simple, casual observations, without intimate acquaintance or even a friendly association. We admit the law to be that testimony of that character, when based on a proper predicate, is admissible, but the predicate is the criterion. If it does not exist, then the evidence is vicious. The rule is that the witness shall address himself to the court and qualify himself, and if pronounced qualified, then he may detail the facts, as well as give an opinion to the jury, on the issue of sanity or insanity. Because the trial court may pronounce the witness qualified does not qualify him in law. It may for the occasion enable the witness to testify, but the ruling of the court on qualification is subject to review, as much so as if the issue involved market values. It must appear that the acquaintance of the witness with the party is such as to enable him to form correct conclusions as to the mental condition. Thomas' Case, 41 Texas, 63, and cases subsequent thereto.

The rule is but one way. The witness must be qualified, from knowledge of and association with the party, to speak to his manner of life, his daily walk and conversation, his action, his eyes, and other indicia which read into the mind and enable the observer to speak, with some degree of certainty and reason, otherwise any man who has seen another one time without speaking to him would be competent to prejudice a case by uttering an opinion upon that about which he knows nothing. There is reason in the rule. The reason should be adhered to. for, take the reason away, and the rule falls. Webb's Case, 5 Texas Criminal Appeals, 608.

It will be noted by the court that the evidence on the question of the sanity of the accused was conflicting, materially so.

Drs. Swearingen, McLaughlin, Smoot, and Tally were of the opinion that accused was insane in July. The other experts who were examined on the defendant's evidence also said he was insane. The State's experts, on the State's evidence, thought him sane. On this great and material conflict of evidence on this vital point defendant deemed it within the rules and practice that are observed to reach the truth, or at least aidful in the effort to reach the truth and solve the issue, to submit to the jury standard authorities in evidence on the subject of insanity, and offered to do so, but the offer was refused by the court. Afterward counsel proposed to read the authorities, as part of his argument to the jury. This was also refused. The point was reserved by bill. Wade v. DeWitt, 20 Texas, 400, 401.

Where the text is pertinent and applicable to the issue, and is of standard authors on the subject matter, the privilege to have the authority before the jury is valuable. We know this character of evidence and its use is largely under the control and subject to the discretion of the court, but that discretion may be abused, and we submit that the discretion in this instance was abused.

Take the situation as it was—a diversity of opinion on the part of the medical experts, the mind of the jury necessarily left in doubt, the burden of proof put on the defendant—what could have so well furnished appropriate light by which the difficulty could have been solved as the fountain of knowledge or information from which the experts get their license to speak? Take away the record of medical science, deprive the experts of that source of information, and put them on the stand, and they would stare as a rule as blankly as a new-born calf. But when they have crammed themselves from the books they speak glibly and dogmatically, when in nine cases out of ten they never had charge of a diseased mind (unless it be their own) in their lives, even if they ever saw a human being being afflicted with mental disorder. The books are compiled from the experience of ages, and represent probably approximate truth. Where is the policy or the wisdom of proscribing the fountain of knowledge and accepting in place of it a rehash of the text by those who have in reality and in truth no more ability to comprehend and assimilate it than the average juror?

Expert testimony, particularly by medical men, is worthy of the very least weight, recognition, or respect. Such is the known fact by the decision of most courts, that it is indeed mere theory, ineffective and inoperative in practice. The courts dare not so charge, but it is permitted, with its contradiction, crudeness, unreliability and imperfections, to go to the jury as truth.

It is time, if there were no experiences other than those furnished by this case, for this court and all other courts, to take a bold, firm, immovable stand against the wrongs that are perpetrated by the testimony of medical experts in murder cases. At the very best, it is not, in dignity, weight, or credibility, equal to a circumstantial link in a chain of evidence.

A question was raised as to the predicate laid by some of the medical men, particularly Drs. Graves, Wooten, Wooten & Wooten, by themselves, to authorize them to testify as experts as to the mental condition of the defendant, and especially his condition at the time of the alleged killing.

It will be remembered that the issue was not as to sanity at the trial, but sanity at the time of the acts charged. The extent of the knowledge of any and all of them of defendant was very limited. They saw him in jail. Dr. Graves had some acquaintance with him, and so did Dr. T. D. Wooten, but Drs. Joe and Goodall Wooten only saw him in jail on two occasions—once for a short time, when they went to measure his head, and again, at the instance of the State, they interviewed him to determine his sanity. While they made some tests as to his then condition, they had no knowledge of him, or if any, the most casual, prior to that time. Dr. T. D. Wooten was present only once at the head measurement, but he had known defendant before, and had had some business transactions with him. None of them had heard the testimony in the case.

The testimony of experts, when they are able men and supported by full knowledge of the facts, is but weak. It is a grave thing for any man to try to determine the condition of the human mind—whether sound or unsound, in or out of balance, whether he knows right from wrong, has will power or not to refrain from doing an act, or if impelled thereto or not, by impulse, hallucination, or delusion.

However, these experts had no difficulty after their hasty examination, superficial and limited in character, four months after the act, in saying defendant was sane of mind on 24th July, 1896—knew right from wrong—had discretion to do or not to do, and possessed the requisite will power to refrain from doing a thing he knew was wrong. They had no difficulty in reading through the mind they found to be a thoroughly sane one four months before.

Under all the facts and circumstances of this case we have no hesitancy in asserting that the testimony of these experts was based on an insufficient predicate, that it was not credible, and ought not to have been cast into the scales of life and death. It was amateurish, experimental, hazardous, and murderous.

The only correction that can be administered to such unjudicial proceedings, in the way of guessing a man's life away, must come from this court. The power lies here, and can be applied. If not applied, and applied firmly and radically, the lives of men will become playthings.

It is not a matter bounded by the judicial discretion of the trial court. It is substantial and material, involving a great principle of evidence, and is worthy the deepest and most deliberate thoughts this court can give it.

Dr. R. K. Smoot was a witness for defendant; was offered as a lay witness for defendant. He had known him from his childhood, intimately. On his knowledge of him and his life he was of the opinion that he was an insane man, and had been so for years. He was then asked what books, etc., he had read on the human mind, etc., and he answered, showing more than usual reading, and being a man of large intellect and great ability, a question was put to him as an expert, he having heard the evidence. He was not allowed to answer his opinion. He was then asked a hypothetical question, based on the evidence. The answer was not allowed. A bill was taken.

What is an expert? In the better sense he is one "who is conversant with the subject matter on questions of science, skill, trade, and others of the like kind." Best's Prin. of Ev., sec. 346.

In another sense, he is one "who is instructed by experience." Again, one "who is professionally acquainted with the science or practice." An expert need not necessarily be a professional man. By no means. If he has studied the subject matter of inquiry, and understands it, he may give his opinion the same as if he were a professor of the art or science.

Some cases say that if a man has studied medicine he may answer as an expert on that science, but that does not admit him to give his opinion on a question of the mind. The human mind is one thing, the human body another. The man who has studied the mind may speak to it. If his study has been limited, that fact goes to the credibility. Experts testify, it might be stated, from three positions: first, a knowledge of the subject of inquiry; second, from having heard the testimony concerning that subject; third, from having all the evidence in regard to the subject of inquiry repeated to him. Dr. Smoot came under all three conditions. He knew the subject of inquiry, the defendant, and was acquainted with the human mind, the status or condition of which was the exact subject of inquiry, as it existed at a period in the defendant. He had heard the evidence and the evidence was repeated to him. He stood in a commanding position to speak with force, power, and truth upon the very question on which the jury had to pass. He was ruled away, and the defendant suffered, was legally injured, in that he was deprived of evidence material to his defense.

The following proceedings were also perpetuated by bill:

When the expert, Dr. M. M. Smith, was on the stand, he stated under objection that one of the reasons why he believed defendant was sane and his actions or demeanor on the trial were simulated, was that in passing

through a raised window way in coming in and leaving the courtroom, he always bowed or lowered or stooped his head to prevent striking it against the lower frame of the sash, which was not raised high enough to pass under in an erect position. This was objected to because it was not matter relevant to the issues on hearing, and was calculated to mislead the jury and prejudice the defendant. Thereafter, on the next day, the deputy sheriff who had charge of defendant in bringing him in and escorting him from the courthouse was put on the stand to prove that soon after the expert, Smith, had testified, court adjourned, and that in going out of the courtroom through the window the defendant did not lower his head, but struck it against the said window frame. Objection was urged earnestly against the reception of that evidence, because irrelevant, immaterial, in and of itself on the issues, and calculated to do defendant the gravest harm; but he was overruled and said evidence let in.

Before proceeding with the several bills of exception reserved by the defendant to the charge of the court, before the same was read to the jury, appellant desires to direct the attention of the court to paragraph 11 of the charge, which is clearly and unmistakably fundamental error, and does not give the jury the law of the case, and is as follows:

"Now, if you believe from the evidence, beyond a reasonable doubt, that the defendant, Eugene Burt, in Travis County, State of Texas, on or about July 24, A. D. 1896, as charged in the indictment, unlawfully, with malice aforethought, with a sedate and deliberate mind, and formed design to kill, did kill Anna M. Burt, by then and there striking, beating, and wounding the said Anna M. Burt upon her head and face with a hatchet and some heavy instrument, thereby fracturing the skull and the bones of the face of said Anna M. Burt, and then and there tying tightly around the throat and neck of said Anna M. Burt a handkerchief, thereby strangling and suffocating the said Anna M. Burt, and by then and there wrapping around the head and body of said Anna M. Burt a blanket, and securely tying same thereon with rope, and then and there throwing said Anna M. Burt, so wrapped and tied, in a cistern partially filled with water, sufficient to submerge the body of said Anna M. Burt; *or if the said defendant did with malice aforethought so kill said Anna M. Burt, by either one or by all of the means above enumerated, you will find the defendant guilty of murder in the first degree,* and so state in your verdict, and fix his punishment at death or confinement in the State penitentiary for life, as you may determine, and so state in your verdict."

That part of said charge which is italicized is separated from the preceding portion of said paragraph by the disjunctive conjunction "or," and makes said charge in express terms, plain, direct, and positive, and tells the jury to find the defendant guilty of murder in the first degree upon malice aforethought without express malice. The first part of said paragraph directs the jury that if "the defendant, Eugene Burt, in Travis County, State of Texas, on or about July 24, A. D. 1896, as charged in the indictment, unlawfully with malice aforethought, with a sedate and

deliberate mind and formed design to kill, did kill Anna M. Burt, by striking, beating, and wounding," etc., they will find the defendant guilty of murder in the first degree, and fix his punishment at death, or confinement in the penitentiary for life. While the latter part of said paragraph, in the plainest and most direct manner possible tells the jury that: "Or if the said defendant did with malice aforethought so kill said Anna M. Burt, by either one or all of the means" enumerated in the indictment, they will find the defendant guilty or murder in the first degree, and assess his punishment accordingly.

What does this last proposition mean? To what does the word "so" refer? Or if the killing was done with malice aforethought by either one or by all of the means above mentioned. The condition of the mind is left off, save that it must be in a state of malice aforethought. Not cool, deliberate, and operating under a formed design, but simply burdened with malice aforethought. So killed by means above mentioned. Killed by the means above mentioned. By the means above mentioned. What means were above mentioned? The hatchet and blows—the handkerchief and strangulation, the water and drowning. The condition of the mind, mentioned in the forepart of the subdivision, is not reached and included by the word "so." It is expressly limited in express terms, to the means used in effectuating the death—the instruments used, and the manner in which they were used. Suppose we read the charge, with the "means mentioned above," in place of the word "so." What would the reading be?

"Or if the defendant did kill with malice aforethought said Anna M. Burt, by striking, beating, and wounding the said Anna M. Burt upon her head and face with a hatchet and some heavy instrument, thereby fracturing the skull and the bones of the face of said Anna M. Burt, and then and there, etc., etc., you will find the defendant guilty of murder in the first degree."

What degree of murder would such facts, if believed, constitute in law? A reading of the Code answers the question.

As stated, the defense in this case was insanity. The court charged in the usual terms, placing the burden of proof on the defendant. The charge was excepted to and bill reserved.

The rule hitherto in this State on that subject is embodied in the charge of the court. But it has never had the concurrence of an undivided bench since the organization of this court. It may not be that a dissent has been noted in every case where the question has come under review, but the dissent has been present nevertheless, and must remain present as long as the judge who delivered the dissenting opinion in case of King v. State, 9 Texas Criminal Appeals, 515, is a member of the court. And the doctrine so announced is held in Davis v. United States, 160 U. S., 471.

There was lacking in all the evidence in this case any that showed motive, cause, or reason for the alleged murder—and was also lacking in every vestige of fact, circumstance, or thing which tended to point to

motive, cause, or reason for the killing on the part of defendant. Under this condition the court charged over the objection and exception of defendant as follows, in the seventh subdivision of the charge: "Or do the facts and circumstances in the case show such a reckless disregard of human life as necessarily includes the formed design against the life of the person slain? If they do, the killing, if it amounts to murder, would be upon express malice."

The objection was, that this paragraph of the charge presented a phase of criminal homicide, and of murder in the first degree, which does not arise out of all the facts or any of them in evidence, and is in no way applicable to this case. Such a charge would be the law in some cases, but whenever and wherever applicable the facts are peculiar, and relate to where the murderous strokes are aimed at mankind, and fall on one or more individuals, because he or they came within reach of the slayer.

The charge of the court must be confined to the issues raised by the evidence. Mayfield's Case, 23 Texas Crim. App., 645.

A charge which has no application to the evidence is radical error. Boren's Case, Id., 28; Wills. Crim. Law, sec. 2337. ·

To constitute murder in the first degree the killing must be done by poison, starving, torture, or with express malice, or committed in the perpetration of certain offenses named. Penal Code, art. 711.

Judge Willson, in summing up the authorities on the subject of murder in the first degree, says: "There must have existed in the slayer at the time of the homicide a sedate and deliberate mind, and a formed design to kill the deceased, or to do him some serious bodily harm, which caused the death of the deceased. The malevolence must be directed at the deceased as its object. There must be a specific intention to take the life of the deceased, or to do him serious bodily harm, the doing of which subsequently caused his death."

The court charged as follows, in the eighth subdivision of charge in chief: "There is, however, no definite space of time necessary to intervene between the formed design to kill and the actual killing; a single moment of time may be sufficient; all that is required is that the mind be cool and deliberate in forming its purpose, and that the design to kill is formed while the mind is in such calm and sedate condition."

The objection in exact substance was, "that there was no evidence on which to base the charge." That charge is applicable when there has been a contest—a physical contention—an assault, a harm, a hurt—or other matter of that character, where passion has been aroused, etc. The law has its channels, and never overflows its banks. When there is an overflow, harm, injustice, and a distortion of the law follows. The court will see that this is not a case for such a charge as that. The charge forces the juror's mind away from the issues made by the evidence, and compels it to a consideration of issues not raised. In this case, if defendant did the killing, he was uninfluenced by passion of the blood—but by some far reaching and deliberate scheme that was not even broached,

much less elucidated by the evidence. There was no ground for the charge. It had no place in the case, and presented an issue with which the jury, in the law of this case, had nothing to do. What had the jury to do with moments or cooling time—as to when intention was formed? There never was a more deliberate murder, carefully planned, and skillfully executed. This part of the charge was alien matter—and naturally drew the minds of jurors off to a provoked killing where it was questionable as to the condition of the slayer's mind.

In addition to what we have said, as to where the burden of proof belongs, when the question of insanity is raised, we call to the attention of the court the following part of subdivision 19 of the charge.

"If the State has, as before explained, proved the facts which constitute the offense charged in the bill of indictment, your next inquiry will be, has the defendant established by proof his plea of insanity, or has it been established from any source? If it has, the law excuses him, and you should acquit him."

The specific objection was and is, that the charge fails to state how the fact of insanity is to be proved—by a preponderance of the evidence or otherwise—and because it fails to charge the reasonable doubt, and puts the burden of proof on that issue on the defendant.

The contention is, that even if the burden of proof was on defendant, that then, when the proof has by its force, credibility, and volume raised a reasonable doubt as to whether defendant was or was not insane, he was at that stage or in that condition of the evidence entitled to the benefit of the reasonable doubt, and the charge should have so stated.

The court charged among other things, in paragraph 20 of the charge, as follows: "But this unsoundness of mind, or affection of insanity, must be of such a degree as to create an uncontrollable impulse to do the act charged, by overriding the reason and judgment and obliterating the sense of right and wrong, depriving the accused of the power of choosing between right and wrong, as to the particular act done."

This part of the charge, in the use of the word obliterating, was extreme—harsh—not only not called for by the facts, but unauthorized by the law on the subject matter charged about. The law does not, before it will excuse crime, require an obliteration of the sense of right and wrong, but only that the mind shall be so impaired that the judgment and the reasoning powers do not comprehend the relations between right and wrong.

The court charged in paragraph 26 of the charge thus: "There has been certain evidence admitted for your consideration, of the examination of the defendant by certain expert witnesses since he has been confined in jail, and of certain acts and conduct of defendant since his confinement in jail on this charge, and his conduct during this trial. This testimony was only admitted for the purpose of explaining or throwing light upon the sanity or insanity of the defendant, at the time of the alleged commission of the offense for which he is on trial, if it does throw

any light upon such question, and not for the purpose of showing that defendant committed the offense for which he is on trial, and you will only consider such evidence for the purpose for which it was admitted."

Was this charge the law? That is to say, was it that character of evidence that should have been nominally limited? If not, it was technical error to give it, and the law requires a reversal of the case. Where a charge recites that if defendant be guilty he should be punished not less than two nor more than five years—when the penalty was not less than two nor more than seven—the error, though clearly in defendant's favor, is reversible error. It is in the nature of fundamental error. Should this evidence have been limited? The purpose for which evidence is limited is to prevent it being used, to the prejudice of defendant, on other points than that to which it is directed. Thus, in a case for perjury, where a judgment is introduced to show the issues decided, it must be limited, or else it may be taken by the jury as decisive of the fact of perjury, and so in other cases. But here this limited evidence had no element in it to prove guilt of defendant, but was only pointed at mental condition. If, however, it was proper to limit its operation and effect, then all the evidence on that subject should have been limited also, such as that of Dr. Davis, Burdett, Gibson, Dr. Graves, Rutherford, and others, who, not being experts, yet testified on the same line with experts—that is to say, they testified from observation of defendant's mental condition before and after the alleged killing. If the one was subject to limitation, so was the other—and in either view, limitation or no limitation, the charge was error.

*Mann Trice,* Assistant Attorney-General, for the State.—Appellant was convicted of murder in the first degree, and his punishment assessed at death.

The record discloses the most brutal murder that ever came before this court for review. While circumstantial, the evidence as to the killing is strong and convincing. This killing was practically admitted on the trial, and insanity relied upon as a defense of the acts of human butchery shown in this record. There is some evidence, strictly hearsay in its nature, tending to show traces of insanity in remote relatives of appellant. There is no evidence, however, tending to show that appellant was ever so afflicted. Nor was he ever regarded in any other way than a sane man until the startling announcement was made during the progress of this trial. Pretermitting at present a discussion in detail of the proof, suffice it to say, out of six experts called upon, none regarded him as insane save and except two, who express the opinion that he was insane at the time of the homicide. The facts, however, upon which they base their conclusion are at variance with the great weight of authority and recognized rules governing and determining the question of sanity. And when tested by recognized rules, the facts and reasons they give as sustaining their view will show that appellant was sane at the time of the commission of the crime, was sane at the trial, and that there was no evidence,

when so tested, indicating that he was insane at any time. As against this theory, the State contends that the killing was upon express malice aforethought, the existence of which necessarily implies the presence and existence of sufficient reason and will power to render appellant amenable to the punishment fixed by law for the crime of murder. Motive, malice, reason, and cause for this killing are made manifest: first, from the fact that a quarrel and dispute between appellant and his wife occurred on the night of the killing; second, his pecuniary embarrassment and his sale of the household furniture; his precipitate flight in order to avoid prosecution under indictments then pending against him in the District Court of Travis County, all of which establish sufficient motive for the killing, and will sustain the judgment for murder in the first degree.

The numerous assignments of error relied upon by appellant for a reversal may be considered under the following heads: 1. The alleged error of the court in permitting the expert witnesses to answer hypothetical questions propounded by the State, for the alleged reason that the same were not based upon all of the undisputed facts in evidence. 2. The improper admission of the evidence of Miss Carrie Sparks. 3. The want of a proper predicate for the admission of opinions of experts and non-experts on the question of sanity. 4. The alleged errors in the charge of the court. Various errors, referable in a general way to the above, are also complained of. All of which will be considered in the order discussed in the brief for appellant.

1. As preliminary to a discussion of the bill of exceptions reserved by appellant, objecting to the hypothetical questions propounded by the district attorney to the experts, it is submitted that the questions sought to be raised by this bill are stated in such a general way—leaving this court to inference and reference to the entire statement of facts in order to ascertain what particular phases of the evidence were omitted in propounding the hypothetical questions—that the bill is therefore defective and not entitled to consideration at the hands of this court. What is meant by the expression, "all the evidence," or "all the undisputed evidence," as used in this bill of exceptions, is left to conjecture. Do counsel mean that the State should have included all of the evidence tending to shed light upon the question of sanity (obviously this is all that would be included), or do they mean that the question should have embraced all the evidence of whatever nature introduced upon the trial. Looking to the bill, we fail to find an answer, but the court is left to conjecture as to what is meant or intended by the grounds of objection stated in the bill. A bill of exceptions to be entitled to consideration should clearly and distinctly set forth the errors complained of, and be complete within itself, without reference to other portions of the record. Therefore the objection should state what facts were omitted, in order to enable the trial court to readily pass upon the question of the materiality or necessity of including the facts or theories in the question; and the bill of exceptions should disclose this, in order to enable this court to pass upon

the identical questions raised. The determination as to whether a hypothetical question should be allowed is one for the court to determine. The form of the question, its length, as to what it should or should not contain, are all questions primarily vested in the discretion of the court. Rogers on Exp. Test., secs. 26-38; Lenning v. State, 1 Chand. (Wis.), 178; State v. Bowman, 78 N. C., 509; Hunt v. Gas Light Co., 8 Gray, 169; Daltz v. Morris, 17 N. Y. Sup., 202.

As stated in the last case cited, "a question should not be so framed as to permit the witness to roam through the evidence and gather the facts as he may consider them to be proved, and then state his conclusions concerning them." Neither should this court be required to roam through the statement of facts in order to determine what facts were improperly admitted in propounding the hypothetical question. The bill should state it, and not leave it to conjecture or speculation. The rule is well settled that the hypothetical question should not be based on controverted questions of fact, nor should it involve contradictory or inconsistent theories. It is not the duty of an expert to reconcile conflicting evidence. This is the peculiar province of the jury, and the inhibitions against its invasion by either court or witness is well established. Neither should the hypothetical question embrace questions of law or be based upon the opinions of other experts. Davis v. State, 35 Ind., 496; Guettig v. State, 66 Ind., 94; Connelly v. People, 53 N. Y., 464.

It is obvious, therefore, that the objection should indicate the fact or facts omitted, in order to enable the trial court to determine whether it would be consonant with the known rules of evidence to include them in the hypothetical question.

Counsel in an elaborate and ingenious brief set forth what they term eight undisputed facts that should have been included in the hypothetical question; and if it should be conceded that the bill of exceptions is sufficient to raise the question, then it is contended by the State that no error is shown: First, because the question propounded by the district attorney substantially embraced all the undisputed evidence tending to shed light on the question of sanity at the time of the commission of the offense; second, because the appellant propounded a hypothetical question to the experts, embracing all the evidence, both disputed and undisputed, and obtained the opinions of the various experts on their respective theories of the case, thus leaving it to the jury to pass on the controverted questions of fact and apply the opinions of the experts to the facts they found or believed to be established. Therefore every fact, theory, or inference deducible from the circumstances of the case, tending to shed light upon the question of sanity, was placed before the expert witnesses, and they expressed their opinion on the different theories presented. This enabled the jury to determine the disputed facts and apply the opinion of the experts to the main fact in issue, to wit, the sanity of the defendant at the time of the murder. This is made clear by the trial court's explanation to the bill of exceptions, as follows:

"This bill is allowed with this qualification and explanation: The evidence in the case was very voluminous and in part contradictory. The fact of the killing itself relied on by the defense as one of the strongest, if not only ground showing insanity, was one of the disputed facts in the case, provable only by circumstances, and it was impossible to form a hypothetical case assuming all the evidence in the case to be true, because there was no direct evidence of the killing, and said evidence was contradictory in part, and the court stated to counsel that the State would be allowed to state a hypothetical case based upon the assumption that her testimony was true and embracing all the evidence for the State, and to ask the opinion of the witness based upon such hypothesis; and that the defendant would be allowed to state a hypothetical case based upon the assumption that his testimony was all true, and on all reasonable inferences to be drawn from such testimony, and to express his opinion based upon such hypothetical case. The State embraced all its testimony in its hypothetical question, and upon the assumed truth of said question, the witness stated his opinion that defendant was sane. The defendant then put its hypothetical case to witness, based on the assumption that all his testimony was true and based on the assumption that all reasonable inferences to be drawn from his testimony were true, including the fact that defendant, without reason, motive, or cause, killed his wife and children, upon which question witness answered that upon such hypothesis he would say the defendant was insane. All the evidence was embraced and included in the State's hypothetical question and defendant's hypothetical question combined."

This clearly shows that the opinions of the several experts were based upon all the facts proved and on all reasonable inferences to be drawn from the testimony, including the assumed fact on the part of appellant that he killed his wife and children without reason, motive, or cause. This last assumption of fact was disputed by the State on the trial, and is here disputed. It was therefore proper for the State to omit this disputed fact, as well as all other disputed facts, from the hypothetical question propounded to the expert witness. This rule is well established in this State, and is supported by the great weight of authority.

"If the expert has not heard the testimony (as in this case), each side to the issue has a right to an opinion from the witness upon any hypothesis reasonably consistent with the evidence, and if meagerly presented in the examination on one side, it may be fully presented on the other; the whole examination being within the control of the trial court, whose duty it is to see that it is fairly and reasonably conducted." Leache v. State, 22 Texas Crim. App., 279; Lovelady v. State, 14 Texas Crim. App., 545; Buswell on Insanity, sec. 263; Rogers on Exp. Test., p. 265; Whart. Crim. Ev., 419; Jones on Ev., secs. 373, 374.

The rule is succinctly stated by Mr. Jones, as follows: "It is sufficient if the question fairly states such facts as the proof of the examiner tends to establish and fairly presents his claim or theory. It can not be ex-

38 Texas Crim. App.—27

pected that the interrogatory will include the proofs or theory of the adversary, since this would require a party to assume the truth of that which he generally denies." This is the universal rule in both criminal and civil cases. State v. Hanley, 34 Minn., 430; Ballard v. State, 19 Neb., 609; People v. Augsbury, 97 N. Y., 501; State v. Anderson, 10 Ore., 448; Conway v. State, 118 Ind., 482; Baker v. State, 30 Fla., 41; McFall v. State, 32 Ill. App., 463; Stearns v. Field, 90 N. Y., 640; Nave v. Tucker, 70 Md., 15; Hathaway v. Ins. Co., 48 Va., 335; Daniel v. Aldrich, 42 Mich., 58; Meeker v. Meeker, 74 Iowa, 352; Woolner v. Spaulding, 65 Miss., 204; Jackson v. Beurcham, 20 Col., 532.

"Counsel may frame the hypothetical question upon the hypothesis of the truth of all the evidence, or of certain facts assumed to be proved for the purpose of the inquiry. The question is not improper simply because it includes only a part of the facts in evidence." Rogers on Exp. Test., p. 65; Williams v. State, 64 Md., 384.

Again: "Each side in an issue of fact has its theory of what is the true state of facts and assumes that it can prove it to be so to the satisfaction of the jury, and so assuming, shapes hypothetical questions to experts accordingly, and such is the correct practice." Connely v. People, 83 N. Y., 464; Davis v. State, 35 Ind., 496; Guettig v. State, 66 Ind., 94; Goodwin v. State, 96 Ind., 550; People v. Goldson, 76 Cal., 328; Coyle v. Com., 104 Pa St., 117.

If, then, the district attorney omitted any material undisputed fact (which we do not admit) the appellant is in no position to complain, for it is clear that on cross-examination he elicited the opinion of the expert witness upon all the facts and theories arising from all the evidence and circumstances in the case. It is well settled that this court will not reverse under such circumstances.

As said by Mr. Rogers, "When the hypothetical question has been improperly allowed because not including certain facts it should have embraced, the error is cured if the cross-examination has supplied the omission and placed before the witnesses all the facts necessary to the formation of an opinion." See Rogers on Exp. Test.; Van Housen v. Cameron, 54 Mich., 384.

By reference to the evidence and theories advanced on the question of insanity, it is plain that if the district attorney had assumed as true all the various theories contended for by appellant and included by him in his hypothetical question, it would have been tantamount to an abandonment of this prosecution and condonation of this most atrocious murder. Counsel for appellant assumed as an undisputed fact, first, that the killing was without reason, motive, or cause. As stated before, this was never admitted or assumed by the State, but on the contrary this assumption was disputed from the beginning. The fact that appellant and his wife were together alone in his house when Miss Carrie Sparks passed there and heard a woman's voice pitched in a high key, saying, "I will stand this no longer," circumstantially shows a controversy and quarrel between defendant and his wife. They were together in the house alone,

and she was murdered on the same night. These undisputed facts are sufficient to sustain the theory of the State that there was both cause and motive for the killing; especially when considered in connection with his impecunious condition; that he had received notice to quit the house in which he lived; that his creditors were pressing hard upon him; that prosecutions for forgery were pending, for which he was under bond; that his sureties were about to surrender him; the appropriation of the money arising from the sale of his household goods; his precipitate and unexplained flight to Chicago—all furnish ample proof of motive, cause, and reason sufficient for his class of moral perverts to commit crime. This theory is intensified when we view him on the day following the murder, busily engaged in boxing the bloody garments and bedclothes; the hatchet with which he committed the foul murder; he was discovered by the cook sitting alone in the kitchen with his hands before his face as if crying; his statement to her that he had trouble—are all potent evidences of a guilty conscience, accusing and rebuking him for his terrible and fiendish crime.

In view of this array of inculpatory circumstances, I can not see how any sane district attorney could have conceded that this killing was without motive, cause, or reason. Therefore the trial court properly refused to compel counsel for the State to assume as true these controverted facts in his hypothetical question. For him to have done so would have been equivalent to an invasion of the province of the jury, whose prerogative it is to determine the existence or nonexistence of disputed facts. I apprehend such a doctrine will never receive the sanction of this court, but will be rejected, as has been done by every court that has yet passed upon the question.

As said by Mr. Jones in his work on evidence, section 374: "Clearly it is not the province of the expert to act as judge or jury. Hence all questions calling for his opinions should be so framed as not to call upon him to determine controverted questions of fact, or to pass upon the preponderance of testimony. Thus, it would obviously be improper to ask the witness to state his opinion upon all the testimony in the case or to any given question, if the truth of part of such evidence were in dispute. When the question is so framed as to call upon the expert to determine on which side the evidence preponderates, or to reconcile conflicting statements, he is in effect asked to decide the merits of the case, which is a duty wholly beyond his province. Whatever liberality may be allowed in calling for the opinions of experts or other witnesses, they must not usurp the province of the court and jury by drawing those conclusions of law or fact upon which the decision of the case depends." Page v. State, 61 Ala., 16; State v. Cole, 94 N. C., 958; Reed v. State, 62 Miss., 405; Bennett v. State, 67 Wis., 69, 46 Am. Rep., 26; McNaughton's Case, 10 C. & F., 200; Gas Co. v. Towlson, 139 U. S., 551.

"The truth of facts assumed by the question is in doubtful cases a question for the jury, and if they find that the assumed facts are not proved, they should disregard the opinions based upon such hypothetical ques-

tions." Rogers on Exp. Test., sec. 373. See People v. Doley, 54 Mich., 148; Trumbull v. Richardson, 69 Mich, 400; U. S. v. McClue, 1 Curtis C. C., p. 9; 1 Greenl. on Ev., sec. 640; 1 Whart. on Ev., sec. 452.

If the rule was as contended by appellant, expert witnesses would be permitted to usurp the functions of the jury and decide controverted questions of fact.

2. No error is shown in the refusal of the trial court to exclude the testimony of Miss Carrie Sparks, to the effect that about 7 p. m. on the night of the killing, when opposite defendant's house, she heard a woman's voice raised in a high key, saying, "I will stand this no longer." It is objected that this evidence was not in rebuttal of the defendant's case, but on the line of the State's case. This is not tenable, for the reason that defendant claimed there was no motive, cause, or reason for the killing. As it was shown that Burt and his wife were the only two persons in the house at that time, this evidence rebutted the theory of the defendant, and tended to affirmatively show a quarrel—a cause for the killing. The rule in regard to excluding testimony at this stage of the proceeding, unless in rebuttal, might be invoked to exclude cumulative, irrelevant, or impeaching testimony. It is within the discretion of the court to enforce the rule when the occasion demands, but it is beyond the power of the court to exclude any relevant evidence necessary to the due administration of justice, and tending to shed light on the main fact in issue, when same is offered before the argument is concluded.

Article 698, Code of Criminal Procedure, reads as follows: "The court shall allow testimony to be introduced at any time before the argument of a case is concluded, if it appear that it is necessary to a due administration of justice." This clearly enjoins upon the trial court the duty of allowing testimony to be introduced at any time before the argument is concluded, if it appear to be necessary to the due administration of justice. The action of the trial court in this regard will not be revised on appeal unless it clearly appears that injustice has been done. Farris v. State, 26 Texas Crim. App., 105; Nally v. State, 28 Texas Crim. App., 387; Hendricks v. State, Id., 416; Malton v. State, 29 Texas Crim. App., 527; Laurence v. State, 31 Texas Crim. App., 601; Gonzales v. State, 32 Texas Crim. Rep., 611.

"On a trial for murder, where a witness had testified to having heard the voice of a woman at defendant's house the evening preceding the homicide, and counsel for the State asked the witness 'Did the noise sound as if the person was in joy or distress, as if she was laughing or crying, or if as she was suffering pain or enjoying pleasure, or if as she was making a mere idle noise, as if nothing was the matter?' the witness answered that it sounded like a woman's voice crying. This was held admissible." Maleck v. State, 33 Texas Crim. Rep., 14. Maleck and his wife were at home when witness heard this. His wife was murdered during the night. Maleck suffered the penalty of the law; so should Burt.

3. In regard to the objection that no sufficient predicate was laid for the introduction of the opinion of the nonexpert witnesses Rutherford and wife, Gibson, and Warmoth, an inspection of the record will show that the witnesses gave their opinions after detailing long acquaintance with appellant and stating the facts upon which they based their opinions. Witness Gibson had known him eleven years, and detailed at length a business transaction he had with appellant just prior to the homicide. As said by the trial court in his explanation of the bill of exceptions on this point, "Witness based his opinion on the facts detailed at length, and not alone upon the facts detailed in this bill." Witness Rutherford related many facts, together with long acquaintance and close observation. He said: "I talked with defendant numberless times; I discussed all kinds of topics with him." The other witnesses lived neighbors to him, saw and talked with him daily, observed his conduct toward his family and related in detail facts, and said they never saw anything unusual or out of the ordinary with him.

The law does not prescribe what facts the witness shall state in order to give his opinion on the question of sanity; it is sufficient if he states the facts upon which the opinion is based.

4. No error is shown by the refusal to permit the introduction in evidence of excerpts from works on medical jurisprudence, or the refusal of the court to permit counsel to read same as the views of the authors, as a part of his speech. The trial court in explaining this bill says: "Counsel were allowed to read any or all of said extracts as his own views or as part of his speech, which he proceeded to do, reading most of said extracts from manuscript copies from said books." Mr. Jones says: "According to the clear weight of authority, scientific books and treatises can not be received as evidence of the matters of opinion which they contain" Sec. 593. See Com. v. Wilson, 1 Gray, 338; Boyle v. State, 57 Wis., 472, 46 Am. Rep., 41.

The objection to this character of testimony is threefold: First, opinions on such questions are constantly undergoing changes, therefore it would be impossible to tell whether the author still entertained the same views; second, it would be hearsay evidence; third, such testimony would be without the sanction of an oath, and the adverse party would not be confronted with the witness, and would have no opportunity of cross-examination. See Ashwood v. Kittridge, 12 Cush., 193, 59 Am. Dec., 178; Ins. Co. v. Bratt, 55 Md., 200.

In some cases when the inquiry relates to the exact sciences, the rule has been relaxed, and tables of logarithms, of weights and measures, and of interest, have been submitted, but on questions not falling within the exact sciences, that is, when a proposition is not susceptible of demonstration according to known and arbitrary rules, the evidence is excluded. Jones on Ev., 594.

On the proposition that the court erred in refusing to permit counsel to read extracts from said authors to the jury, he cites Wade v. Dewitt, 20 Texas, 398. If this case be adopted as the proper authority to govern,

then no error is shown, for this case vests the question in the sound discretion of the court.

"It has been repeatedly held that the extent to which counsel may in argument be permitted to read from books, whether legal or scientific, is a matter confided to the sound discretion of the court, and one which this court will not revise, unless it is made to appear that this discretion has been abused to the prejudice of the defendant." Cross v. State, 11 Texas Crim. App., 87; Hines v. State, 3 Texas Crim. App., 483; Bowen. v. State, 3 Texas Crim. App., 617; Bingham v. State, 6 Texas Crim. App., 169; Foster v. State, 8 Texas Crim. App., 248.

No abuse of discretion is shown in this case. The court permitted the extracts to be read as part of counsel's speech, but refused to sanction it as evidence. The great weight of authority is against permitting the practice of reading scientific books to the jury at all. The practice is not under any circumstances allowed in England. See Rex v. Crouch, 1 Cox Crim. C., 94; Rex v. Taylor, 13 Cox Crim. C., 77.

"The same objections which have been deemed sufficient to exclude scientific treatises as evidence would seem to be equally potent against the right of counsel to read extracts therefrom as a part of their argument to the jury. It is difficult to see how any distinction can be made between the two cases and how any such right can be recognized by any court which maintains the inadmissibility of the treatise in evidence." Rogers on Exp. Ev., sec. 179; People v. Wheeler, 60 Cal., 581, 44 Am. Rep., 70; 59 Am. Dec., 178, and notes.

5. A proper understanding of the record will effectually dispose of the matters complained of in subdivisions 5, 7, and 8 of appellant's brief.

These matters refer to the evidence given by Drs. Joe and Goodall Wooten and Dr. M. M. Smith in reference to the sanity of appellant several weeks prior to the trial, and on the trial.

The first objection raised is as to the predicate laid to authorize Drs. Wooten to testify as to appellant's sanity at the time of the commission of the offense. This is urged in argument, while the record shows that neither of these gentlemen testified to anything based upon their examination in jail except as to the condition of appellant's mind at the time of examination in jail and on the trial. The trial court says: "This bill is allowed with the following explanation and qualification: That the question asked the witness was whether or not from his examinations of defendant, and the facts to which he had testified, he was insane at the time of such examinations, instead of on July 24, 1896. To which question the witness answered, that in his opinion the defendant was not insane at the time of such examinations, which was a few days before this trial began."

As to the predicate and their qualifications as experts, it appears that these gentlemen are graduates of the best school of medicine in the United States. They subjected appellant to a rigid examination in accord with the most scientific methods known to the medical profession.

They made fourteen measurements of his head, and compared the measurements and diagram drawn therefrom with twelve hundred normal craniums, with the result of finding appellant's head normal in almost every particular. Various tests were then made as to will power, by standing him erect with eyes closed and heels together, taking "knee jerks" in this attitude; and altogether applying known and recognized infallible tests, then making comparative tests. To read the testimony of these gentlemen will force the admission of their qualification in every particular. Dr. Smith and Mr. Hughes testified to certain acts of appellant during the trial as tending to show the condition of his mind at that time, and putting it beyond question that he was simulating. It occurs to me that the defense is in no position to complain in this regard, as he had made profert of appellant and his conduct upon the trial, calling special attention to this in order to show that he was insane. This gave the State the right to traverse this by cross-examination, or by independent testimony tending to explain or contradict the theory advanced by the acts introduced by appellant.

But it is insisted that appellant was in jail and had not been warned when the examination was made by the medical experts; therefore the result of the examination or anything learned in that way could not be given in evidence. This as an unexplained abstract proposition might require notice and consideration at your hands, but when considered, as it must be, in the light of the surrounding circumstances attending its introduction in evidence, its competency and admissibility is put beyond controversy. Adams v. State, 34 Texas Crim. Rep., 472.

Appellant asserts that his execution would be judicial murder. The trial court and district attorney are arraigned in scathing and terrific terms, and this court appealed to in the most solemn manner to correct what they please to term an "unjudicial proceeding." Now, if these assertions and implications be true, justice demands a correction; but before you proceed to enter judgment on these matters, your attention is directed to the record. Looking there you will fail to find corroboration of the extraordinary position assumed by appellant in argument in this case.

What are the facts in this regard? Drs. Wallace, Worsham, Swearingen, Wooten, Wooten, and Tally, at the instance of the defense, made an examination of appellant while in jail with a view of testing the question of his sanity. Two of the seven experts making this examination were called by appellant as witnesses and gave testimony to the effect that appellant was insane, basing their opinions in part upon what they saw of appellant in jail. What peculiar "sanctity or divinity hedges around" expert testimony that it can not be traversed, criticised, or cross-examined? Some theorist may contend that this character of testimony is beyond question, cavil, cross-examination, or dispute; but such doctrine has never found lodgment or recognition in the laws of the land. Such testimony stands upon the same basis as other testimony. It may be

criticised, qualified, contradicted, limited, or impeached the same as any evidence given in the trial of a case. When either party offers in evidence any relevant fact or circumstance tending to prove or disprove any disputed issue in the trial of a cause, the right to contradict or explain such testimony immediately accrues to the opposing party. This right is exercised by cross-examination, or by the introduction of independent contradictory evidence, or by both. This is fundamental. Therefore the State had the right to and did offer in evidence the testimony of Drs. Wallace, Worsham, Wooten, Wooten & Wooten, and Dr. Mat Smith, most of whom were present at the instance of the defense when said examination was made.

Their evidence in this regard was confined to the question of sanity at the time the examination was made and at the time of the trial, and was permissible as tending to contradict the experts who said he was insane, and shed light on the question of his sanity at the time of the commission of the offense, and was by the charge of the court properly limited. It would be a strange doctrine, indeed, that would permit a defendant to select and introduce isolated exculpatory facts, and then refuse to permit the State to contradict or explain them. This would be a travesty upon justice, and in violation of the fundamental rules underlying and governing the ascertainment of the truth of any fact in issue.

6. Regarding the exclusion of the testimony of Dr. Smoot, as an expert, it is deemed sufficient to say that he is a doctor of divinity, and not a doctor of medicine, and made no pretense or claim to being an expert on diseases of the mind. It is true the examination developed that he had read many books on moral and mental philosophy—nothing, however, out of the ordinary course of study necessary to the attainment of polite accomplishments in his profession, as distinguished from a special study of insanity. The trial court qualifies this bill as follows: "That witness was offered as an expert witness, and objection sustained because witness did not qualify himself as an expert, and he had already testified as a layman as to defendant's sanity, as shown by the statement of facts."

It is hard to conceive how this witness, not even claiming to be an expert or pretending to know or give the clinical history, pathological theories, prognosis, diagnosis, or treatment of any disease of the brain, or any form of sanity, could possibly be regarded as an expert. Under the predicate laid as it appears in this record he was clearly incompetent to testify as an expert. There would be as much reason to require the superintendent of the lunatic asylum to define the shades of doctrinal difference between the Seventh-Day Adventist and the Hardshell Baptist as there would to have required or permitted Dr. Smoot to testify as an expert in this case.

7. Appellant assails the charge of the court in five particulars. The objections will be discussed in the order presented by appellant, except the objection that the charge places the burden of proof of insanity upon the defendant, which will be discussed last.

As preliminary to a discussion of the charge, I will state there is not a line, sentence, or word in the entire charge not authorized and demanded by the evidence and approved by the great weight of authority.

(1.) It is contended that the latter clause of paragraph 11 gave the jury the option to find defendant guilty of murder in the first degree upon either express or implied malice. This paragraph of the charge when read as a whole and considered in connection with the paragraph defining express malice, is not open to the objection urged. The first subdivision of this paragraph informs the jury that if appellant "did, as charged in the indictment, unlawfully, with malice aforethought, with a sedate and deliberate mind and formed design to kill, did kill Anna M. Burt, by" (here all the means alleged in the indictment are set out), "then find him guilty of murder in the first degree." The court, in paragraphs 7, 8, 9, and 10 properly defined express malice, and the jury were clearly and distinctly told they must believe its existence beyond a reasonable doubt before they would convict of murder in the first degree. "Malice aforethought" includes express malice; therefore it is unnecessary to repeat the definition in subsequent portions of the charge. Vela v. State, 33 Texas Crim. Rep., 322.

There is, however, no room for the construction urged by appellant, that the language used in the second subdivision of this paragraph permits the jury to find a verdict of murder in the first degree upon proof of implied malice, as it is clear the words "so kill," as they are used, relate and refer back to the condition of mind at the time of the killing, as well as the means used.

The second subdivision of this paragraph says: "Or if the said defendant did with malice aforethought so kill said Anna M. Burt by either one or all the means above enumerated, you will find defendant guilty of murder in the first degree." Appellant insists that the term "so kill" refers only to the means; that is, to fracture of the skull, tying the handkerchief around her neck, submerging her body in the water, so as to effect her death by drowning and suffocation; and that it does not refer to the condition of defendant's mind at the time he formed the design to kill. Just how this construction can be entertained I am unable to see, as the means and the condition of the mind are cojoined in the first subdivision of this paragraph. It is therefore clear that the term "so kill" relates and refers back to both the condition of the mind and means used in effecting the killing.

(2.) Objection is made to the last subdivision of paragraph 7 of the charge, which reads as follows: "Do the facts and circumstances in the case show such a reckless disregard of human life as necessarily includes the formed design against the life of the person slain. If they do, the killing, if it amounts to murder, would be upon express malice."

It is objected that this paragraph presents a phase of criminal homicide and murder in the first degree which does not arise out of the facts in evidence. It is insisted that this charge is only applicable when the murderous strokes are aimed at mankind in general and fall on one or

more. I concede that this is illustrative of one of the causes that would call for the charge in question, but it by no means furnishes the only and exclusive fact or reason that would call for the charge in question. Appellant concedes that if a party were to shoot into a crowd of people, while entertaining no specific malice against the persons slain, yet the act would show such a reckless disregard of human life that it would be sufficient to show express malice. If this be true as to a killing where one of a crowd is killed under circumstances of such wanton malignity, why would it not be true if the entire crowd were slain? The facts in this case show that he killed his wife and two children, the only inmates of the house beside himself. Their bodies were found concealed in the cistern, tightly bound, hand, foot, and neck—the binding of the neck being sufficient to have caused death, in addition to their skulls appearing to have been crushed or broken by some blunt instrument. These circumstances of enormity, cruelty, and deliberate malignity suffice to call for the charge and to show that the killing was done with express malice—therefore, murder in the first degree. Clark v. State, 29 Texas Crim. App., 357; Cook v. State, 30 Texas Crim. App., 607; Lewis v. State, 15 Texas Crim. App., 647; Swofford v. State, 3 Texas Crim. App., 76; Gaitan v. State, 11 Texas Crim. App., 544; Spearman v. State, 34 Texas Crim. Rep., 279.

In Clark's Case, 29 Texas Criminal Appeals, 357, it appeared that deceased, a peddler, in company with one Blanks, had gone to sleep by a campfire. Clark in passing by the campfire saw them, got his gun, and then went to the camp and shot and killed Williams. Deceased was shot with buckshot, the shot entering the side of his head, nearly tearing away the left side of his face. Blanks ran off and reported the killing to the officers. No motive whatever was shown for the killing. The only facts relied on for proof of express malice was the wanton, cruel, and malignant manner of the killing. Clark was convicted and his punishment assessed at death, and this court sanctioned and affirmed the judgment.

As said by Judge Hurt in Lewis v. State, 15 Texas Criminal Appeals, 665: "Express malice is where one with a sedate and deliberate mind and formed design kills another; and this formed design is evidenced, proven, by external circumstances discovering that inward intention; and this formed design, inward intention, is discovered, made manifest, by such external circumstances as taking life by starving, torture, etc., or by lying in wait, or antecedent menaces, former grudges, and concocted schemes to do bodily harm. These are illustrations of the external circumstances which discover the formed design, the inward intention, but they do not exhaust the whole field of facts and circumstances by which the formed design, the inward intention, may be discovered. If it is shown by any fact or circumstance—is made manifest—that one with a sedate and deliberate mind and formed design kills another, the killing would be upon express malice, and these external circumstances discovering the formed design may transpire at the time of the killing, as well as before. 'For though the killing be upon a sudden difficulty, it may be attended with such circumstances of enormity, cruelty, deliberate malignity, cool, cal-

·culating compassings, or even calm demeanor and absence of passion, as will be sufficient evidence to establish the inference that the killing was the result of a sedate, deliberate mind and formed design to take life.' "

Wherefore the acts of cruelty as before recited called for and absolutely demanded the charge in question.

(3.) The eighth subdivision of the charge, which informed the jury, "There is, however, no definite space of time necessary to intervene between the formed design to kill and the actual killing," was also absolutely called for and demanded by the evidence in the case, in this: As before stated, the evidence while circumstantial, almost positively shows that the deceased was engaged in a quarrel with Mrs. Anna M. Burt several hours before the killing. It also appears that after this quarrel the nurse returned to the house, saw them together, and he bore no evidence of excitement or anger. Again, the theory that this killing was prompted by avarice, that is, to obtain the money for which he sold the household goods, and by his desire to flee the country and avoid prosecution, would indicate that the design to kill was formed prior to the killing, and that the killing was not the result of a sudden rash, inconsiderate impulse. It was the duty of the trial court to tell the jury that the killing must have been the result of a previously formed design to kill, before he would be guilty of murder in the first degree. And in this connection it is equally important, and sustained by all the authorities, that there is no definite length of time necessary to intervene between the formation of the design and the actual killing, and it is proper to so inform the jury.

(4.) Paragraph 20 of the charge, wherein the word "obliterating" occurs, which is complained of, is an exact copy of the charge given in the Leache Case, 22 Texas Criminal Appeals, 279, and approved time and time again by this court. We quote from said opinion as follows: " 'A safe and reasonable test in all cases would be, that whenever it should appear from all the evidence that, at the time of doing the act, the prisoner was not of sound mind, but was affected with insanity, and such affection was the efficient cause of the act, and that he would not have done the act but for that affection, he ought to be acquitted. For in such a case reason would be at the time dethroned, and the power to exercise judgment would be wanting. But this unsoundness of mind or affection of insanity must be of such a degree as to create an uncontrollable impulse to do the act charged, by overriding the reason and judgment and obliterating the sense of right and wrong and depriving the accused of the power of choosing between right and wrong as to the particular act done.' " P. 311. This charge was given in the case of Hopps v. People, 31 Illinois, 385, and approved by this court. See Williams v. State, Dallas term, 1897.

"There must be a total want of reason and power to distinguish between right and wrong in order to excuse crime." It must be a man totally deprived of his understanding and memory. 16 How. State Trials, 764; 19 How. State Trials, 947. It matters not how this is expressed, whether by the use of the term "obliterating" or whether by tell-

ing the jury that he should be totally deprived of his sense of right and wrong. The test is, if he can distinguish between right and wrong as to the particular act, then he is amenable to the law. Therefore it matters not how this is expressed, so it conveys the meaning intended.

8. Defendant insists, as the charge of the court places the burden of proof upon the defendant to show insanity, that this is erroneous and is sufficient to demand a reversal.

The doctrine contended for by appellant first found expression in the Court of Appeals of New York in 1857. See People v. McCann, 16 N. Y., 58. Since then, Michigan, Kansas, Nebraska, New Hampshire, New Mexico, Wisconsin, and the Supreme Court of the United States have adopted the rule contended for by appellant. As against this, Alabama, Arkansas, California, Georgia, Iowa, Kentucky, Louisiana, Maine, Massachusetts, Minnesota, Missouri, Nevada, New Jersey, North Carolina, Ohio, Pennsylvania, South Carolina, Virginia, West Virginia, as well as Texas, have practically adhered to the rule as it has existed from time immemorial, that the law presumes that all men are sane, and if insanity of any person be alleged it is incumbent on the party alleging it to prove such insanity. Therefore the correlative rule obtains that the burden of proof rests upon the party alleging insanity. Best on Presumptions, 57-70; Greenl. on Ev., secs. 42, 372, 373, 689; 3 Starkie on Ev., 404, 405; 4 Starkie on Ev., 1234, 1244, 1246; Shelf on Lunacy, 50; 1 Coll. on Lunacy, 51; Whart. on Crim. Ev., 340; Whart. on Homicides, 688; Russ. on Crimes; Busw. on Insanity, 159, 162, 170, et seq.

As tersely said by Judge Nees, 5 Johnson, 158, "To say that sanity is not to be presumed until the contrary is proved, is to say that insanity or fatuity is the natural state of the human mind."

Therefore, following the universal rule at common law, and by the great weight of authority in this country, when the acts constituting the offense appear, it devolves upon the party seeking to escape the consequences of the act on the ground of insanity to prove the same, before the law would excuse him for the commission of the act.

Perhaps the strongest contributions to be found in legal literature opposing this theory is the opinion of Justice Harlan of the Supreme Court of the United States (160 U. S., 471), and the dissenting opinion of Judge Hurt in Webb v. State, 9 Texas Criminal Appeals, 490, and more fully and elaborately expressed in his opinion in disposing of the case of King v. State, 9 Texas Criminal Appeals, 515. To say that the arguments there advanced are not strong and persuasive would be to admit a want of appreciation of the subject discussed. But from the view we entertain, these arguments should more properly be addressed to the legislative branch of the government than to the judiciary.

After the adoption by the Court of Appeals of New York of this rule, several other States also adopted it, after which this State enacted articles 40 and 52 of the Penal Code, article 722, Code of Criminal Procedure, which, to my mind, furnishes the rule for the guidance of the court, and puts the question beyond the domain of discussion. Article 40 of the

Penal Code provides: "The rule of evidence known to the common law in respect to the proof of insanity, shall be observed in all trials where that question is in issue." There is no authentic record of any rule at common law contravening the proposition above advanced, that is, that the law presumes sanity, and the burden of proof to establish insanity is upon him who asserts it. This was reiterated and reasserted in the opinion of the English judges in answer to the questions propounded to them by the House of Lords, and continues in force to the present day. As said by the judges: "Every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction. To establish a defense on the ground of insanity, it must be clearly proved that at the time of committing the act the accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong. If the accused was conscious that the act was one that he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable." See Russell on Crimes, p. 19.

But lest there be controversy as to the rule at common law, and whether it prescribes just where the burden of proof lays and when it should shift, the enactment of article 52 of the Penal Code, it occurs to me, cuts off discussion on that line, and fixes the rule beyond the peradventure of a doubt. This article reads as follows: "On the trial of any criminal action, when the facts have been proved which constitute the offense, it devolves upon the acccused to establish the facts or circumstances on which he relies to excuse or justify the prohibited act or omission." This declaration of the legislative will is so plain and explicit that there seems to be no room for construction. However, the courts in construing this article have universally held, that "where the defendant relies upon any substantive, distinct, independent matter as a defense, such as insanity, nonage, license to do the act, or the like, then it devolves upon him to establish such defense by a preponderance of the evidence, and it would not be error to instruct in such case that the burden of proving such defense devolves upon the accused. See Jones v. State, 13 Texas Crim. App., 1; Thomas v. State, 14 Texas Crim. App., 200; Donalson v. State, 15 Texas Crim. App., 25; 16 Texas Crim. App., 173; 17 Texas Crim. App., 174; 18 Texas Crim. App., 71; 19 Texas Crim. App., 111; Leache v. State 22 Texas Crim. App., 279; 28 Texas Crim. App., 291; 32 Texas Crim. Rep., 526.

As said in King's Case, and by Judge Davidson, in Smith's Case, 31 Texas Crim. Rep., 18: "The law presumes every man to be sane, and that presumption alone will of itself sustain the burden of proof which is devolved upon the State in every criminal case, so far as insanity is involved, until it is rebutted and overcome by satisfactory evidence to the contrary. Naturally, and in fact, the burden to rebut this presumption rests with and is upon the defendant, and he should be able to show his

insanity clearly, and to that extent that the minds and consciences of the jury can say that on account of his insanity he was guiltless of entertaining the criminal intent essential to responsibility for the crime charged." To the same effect is Smith v. State, 19 Texas Crim. App., 95; Giebel v. State, 28 Texas Crim. App., 151; Smith v. State, 22 Texas Crim. App., 317.

In the case of Boren v. State, 32 Texas Criminal Reports, 637, it appears that Hon. Tom Brown (then district judge, but now on the Supreme bench) charged the jury: "If you have found that the evidence in this case establishes beyond a reasonable doubt that the defendant killed said deceased as charged, under circumstances which would make him guilty of murder in the first or second degree, then, in order for the defendant to be exempted from punishment for the crime he committed, if any, upon the ground of his insanity, it devolves upon him (defendant) to establish by a preponderance of the evidence, that at the time the crime was committed he was insane to that degree that would exempt him from punishment." Judge Hurt in deciding this case says: "We have with the greatest scrutiny read the charge of the court on the subject of insanity; read it in the light of the objections made to it, but we must say that the objections urged are not well taken when tested by the opinions of this court. The writer has many objections which could be argued to the principle contained therein, but my views on this subject have not prevailed, and I will urge them no longer, though unshaken in the belief of their soundness." He further says: "The evidence is conflicting with regard to the one issue in the case, to wit, insanity. The jury decided this issue against the appellant, and we can not say that the verdict is not sustained by the evidence. The burden was on the defendant to prove insanity by the preponderance of the evidence; his triers say that he failed to do this, and we can not say that they were wrong."

In Williams v. State, Wheatley v. State, and Hurst v. State, Judge Henderson, delivering the opinion of this court, adhered and reaffirmed the doctrine announced in the King and Leache cases, and all the other cases upon this subject in this State. Judge Brooks in charging the jury in this case but followed in the wake of these authorities, and as before stated, whatever might be the individual opinion of the members of this court and as to what the rule should be, the plain, unmistakable, and positive enactments of the Penal Code above quoted should prohibit a change of the rule so as to conform to the contentions so ably urged by the appellant's counsel in this case.

As said by Judge White in Webb's Case: "We do not deem it necessary to unravel or attempt to answer the misty mazes and metaphysical disquisitions indulged in by opposing theorists about sanity being essential to criminal intent, and criminal intent being essential to punishable crime, nor their equally abstruse and obscure views as to which side has the burden of proof, when the sanity of defendant acquires a status in the case." 9 Texas Crim. App., 512, 513.

This is settled by the common law, which has justly been characterized as the perfection of human reason. It has been re-enacted by solemn statutory enactments as manifested by articles 39 and 52 of the Penal Code, and article 722 of the Code of Criminal Procedure. If appellant's theory be correct, our entire system is wrong and should be revised, for under the law as it exists, this man could not be confined as a lunatic unless it was clearly proved that he was insane. He could not avoid a contract or ordinary obligation on the ground of insanity unless he clearly established his insanity, and the burden of proof under all the law to which I have had access would devolve upon him. How then can it be said that he can avoid the penalties of the law for the crime of murder on a less degree of proof than he could avoid a contract to pay money or to perform an obligation? It seems to me absurd to say that the burden of proof is upon him to establish his insanity in order to avoid a $5 contract, and would not be upon him to avoid the pains and penalties attached to the most dastardly and shocking crime that ever blotted the leaves of our history. No, your honors, the rule should not be changed, but it should stand as given by Judge Brooks in this case. It is the rule that governs every civilized nation upon the globe. It has in the past, so far as authentic history records, governed those that have gone before, and is to-day the rule the world over, except in the few States above mentioned.

9. In view of the overwhelming evidence showing defendant's sanity as against the naked assertion of insanity, it occurs to me no different result could have been reached, even though the court had given in charge all the theories advanced by appellant.

Under the proof in this case defendant could not be confined in jail or in the asylum on the ground of insanity. Nor could he avoid the performance of any of his civil contracts on such plea, for the reason, that instead of the proof preponderating in favor of insanity, it clearly shows his sanity.

This is manifest when we look to and carefully weigh the testimony and test it by known rules in determining the question of sanity. If all the evidence introduced by the State showing sanity be eliminated and leave the case to stand alone upon the evidence of defendant, I confidently assert it is not sufficient when tested by known rules on the subject to overcome the presumption of sanity.

Now let us examine the evidence for defendant on this question. Dr. R. M. Swearingen regarded defendant insane, though he admits that the reasons upon which he arrived at and bases his opinion are against the weight of standard authority upon the subject. He says: "I saw the dead bodies that are said to be the bodies of his wife and children, and they were horribly mutilated and murdered, and I said then it was the work of a lunatic, and have had no reason to change my opinion. It was the horrible butchery of the whole family that made me form the idea of the insanity of the criminal." Again: "I did not find in the defendant

in examining him in jail any physiological manifestation of fact that he was a congenital moral pervert." On page 115 he says: "The most convincing fact to my mind which makes me believe the defendant insane is that he killed his wife and children.  *  *  *  I do not think any man sane would kill his wife or children. I know of no medical authority that bears me out in this phase of the case. I admit that medical authority is opposed to me in this position, but I have that opinion nevertheless.  *  *  *  I think the defendant understood the nature and character of the act he committed. I believe the defendant knew the act he committed that night, if he did it, was wrong. Upon the question as to whether he had the will power to desist from the commission of the act, I have no opinion."

If this shows insanity, then any expression to be found within the range of medical jurisprudence is wrong, for it is universally held that under such circumstances there is legal responsibility.

In regard to showing insanity by the character of the act—that is, cruelty—Mr. Ray says: "To seek to prove insanity from the character of the act would be regarded as nothing less than begging the question." Ray's Med. Juris., sec. 12.

Dr. Swearingen assumes, which is not shown, that the killing was as contended for by appellant, without reason, cause, or motive. As said by Mr. Russell in his work on Crimes, p. 23: "It has been urged that no motive has been shown for the commission of this crime. It is true that there is no motive, apparently, but a very inadequate one; but it is dangerous ground to take, to say that a man must be insane because men fail to discern the motive for his act. It has also been said that the conduct of the prisoner was that of a madman in committing the offense at such a time, in the presence of the woman's husband, who had arms within his reach; but it would be a most dangerous doctrine to lay down, that because a man committed a desperate offense, with the chance of instant death and the certainty of future punishment before him, he was therefore insane, as if the perpetration of crimes was to be excused by their very atrocity." Reg. v. Stokes, 3 C. & M. K., 185.

Another expert, whose chief qualification seems to consist in the fact that he is a near relative of defendant, studied the case and the man for two weeks, and concluded by giving his opinions based upon facts not in the case, and at variance with all the authorities, that appellant was insane; that is, by assuming something that did not exist and not supported by the evidence.

Appellant lays great stress upon Dr. McLaughlin's opinion as to his sanity. I fail to find any fact he testified to that could be of comfort to the theory of the defense. After counsel had stated all of his theories and disputed facts, including the unwarranted assumption that he killed his wife and children without reason, motive, or cause, Dr. McLaughlin said: "I would certainly judge him to be morally insane. I mean by moral insanity that the person so affected is depraved and has no moral sense, but has reasoning faculties." He knew him well; was his family physician.

He "never noticed any evidence of insanity;" and "I had not and would never have suspected it." He further said: "In my opinion, any man who would kill his wife and children without great motive is insane."

The guarded expressions of this eminent physician can not by fair construction be made to say that Burt was insane.

It is significant that no lay witness who knew Burt well and had associated with him and observed him closely regarded him as insane.

Then, looking to the testimony of the State, we find the most distinguished men in the medical profession of Texas, well versed and skilled in disease of the mind, after careful study and examination of the man, his history, and the history of the case, pronounced him sane.

The testimony of Drs. Wallace, Wooten, Worsham, Wooten, Davis, and Smith, while a crushing blow to the feigned issue of insanity in this case, will stand as an ample vindication for the visitation of the supreme penalty of the law on this heartless murderer. He has been tried and condemned according to legal and constitutional rules; no palliation or excuse can be offered for his brutal acts. "Justice should not go begging through the realms of law."

Therefore, it is respectfully submitted that the judgment should be affirmed.

HURT, Presiding Judge.—W. E. Burt was convicted in the District Court of Travis County of murder in the first degree, the jury assessing his punishment at death. The evidence in this case, though circumstantial, establishes beyond all controversy that appellant killed his wife and two little children. This being the case, under the circumstances attending the homicide, he was evidently guilty of murder of the highest degree, if sane. The defense was insanity.

First error assigned: It appears that counsel for the State submitted to the expert, Dr. Wooten, a hypothetical case, and then asked his opinion as to the sanity or insanity of the defendant. Dr. Wooten answered that he believed him sane. Counsel for State then submitted to the expert a case based on all of the evidence, and received the same answer. Counsel for defendant then submitted his hypothetical case, and obtained from Dr. Wooten the answer that in his opinion the defendant was insane. As appears from the bill of exceptions, full opportunity was given defendant to obtain the opinion of the expert upon any hypothesis supported or inferable from any evidence in the case. Notwithstanding appellant submitted his case to the expert, and counsel for State submitted its case, yet appellant objects, because the opinion was obtained before a full case had been submitted. What, therefore, are the rules governing this proceeding? The Supreme Court of Indiana, speaking through Coffey, J., in the case of Davidson v. State, 135 Indiana, 261, 34 N. E. Rep., 972, say: "In the examination of expert witnesses, counsel may embrace in hypothetical questions such facts as he may deem established by the evidence, and, if opposing counsel does not think all the facts established are

included in such question, he may include them in questions propounded on cross-examination. Any other course would result in endless wrangles over the questions as to what facts were and what were not established." Citing Goodwin v. State, 96 Ind., 550; Rog. Exp. Test., 39; Stearns v. Field, 90 N. Y., 640. The proposition asserted in Stearns v. Field, 90 New York, 640, is as follows: "If testimony of an expert is proper, counsel may ask a hypothetical question, assuming the existence of any state of facts which the evidence fairly tends to justify. An error in the assumption does not make the interrogatory objectionable, if it is within the possible or probable range of the evidence. And it seems that such a question is not improper because it includes only a part of the facts in evidence." Citing, among other cases, Cowley v. People, 83 N. Y., 464. In Cowley v. People, supra, the learned judge says: "Another question raised is as to the admissibility of the hypothetical question put to medical experts sworn as witnesses. The claim is that the hypothetical question may not be put to the expert, unless it states the facts as they existed. It is manifest, if this is the rule, that, in a trial where there is a dispute as to the facts, it can be settled only by the jury, and there would be no room for the hypothetical question. The very meaning of the word is that it supposes—assumes— something for the time being. Each side in the issue of facts has its theory of what is the true state of the facts, and assumes that it can prove it to be so to the satisfaction of the jury, and, so assuming, shapes hypothetical questions to experts accordingly, and such is the correct practice." Citing Erickson v. Smith, 2 Abb. Dec., 64 People v. Lake, 12 N. Y., 358; Seymour v. Fellows, 77 N. Y., 178.

Counsel for appellant do not contend that the State did not submit to the expert a full case as the basis of his opinion, and, if this contention is made, it is not true. The contention is that counsel for the State submitted a case based upon its testimony, exclusive of that for the defense, and obtained the opinion of the expert, and then proceeded to submit to the expert a case based upon all the evidence, and that the opinion should not have been given until a full case had been submitted. Not that a full case was not submitted, but that it was not submitted until after an answer was given by the expert. Nor is it contended that counsel for defendant did not submit a full case to the expert, and obtain his opinion thereon. The bill of exceptions shows that this was done. Now, then, a case based upon all the evidence was presented to the expert by counsel for the defendant, as well as counsel for the State. This being so, we can not hold that the answer which was obtained under the above circumstances should be held error for which this judgment should be reversed. Suppose counsel stating the hypothetical case should, unintentionally or through ignorance, omit to embrace therein a fact relevant to the question of sanity, and the opposing party should object, because all the facts are not embraced within the hypothetical case, calling attention to no fact omitted, would he be permitted to complain? Should the judgment be reversed because of such error, if this should be error? Certainly, no. If every fact which is relevant must be included in the hypothetical case

to authorize an answer from the expert, then, we assert, there are but few lawyers, if any, in this State or elsewhere, who have the capacity to correctly submit a hypothetical question of this character. Take a case in which there are a great number of witnesses, each swearing to acts and conversations of the accused covering a great number of years, to all manner of social and business transactions, to his facial expression, etc. Who would be able to cull from this huge mass of testimony that which was relevant to the question of sanity, and submit it to the expert, without omitting some fact that perhaps would be pertinent to the issue of sanity? Failure would be inevitable, and to permit the opposing party to object because all of the facts were not embraced in the hypothetical case, and on appeal reverse the judgment on this account, would result in the reversal of all judgments in this character of cases, or altogether deprive the party of the benefit of expert testimony on a hypothetical case. This being the probable result of such a rule, with much greater reason should we hold, where, as in this case, a full case has (whether by the State or the defendant) been submitted as the basis for an answer, that there would be no error, and especially no reversible error. We are not treating of a case in which the expert gave an opinion without hearing all of the evidence. This was the question discussed in Webb v. State, 9 Texas Criminal Appeals, 490, and in Leach v. State, 22 Texas Criminal Appeals, 279, referred to by counsel for appellant. Judge White, in his opinion in the latter case, says: "Where the expert has not heard the evidence, each side has the right to an opinion from the witness upon any hypothesis reasonably consistent with the evidence, and, if meagerly presented in the examination on one side, it may be fully presented by the other; the whole examination being within the control of the court, whose duty it is to see that it is fairly and reasonably conducted." It would seem that the learned judge below had this case in mind in the trial of the case now before us.

Miss Carrie Sparks testified for the State that she knew where defendant lived on the 24th day of July, 1896; that, about 7 o'clock p. m. of said day, she was passing said house, and heard a voice—a woman's voice—pitched high, saying, "I am not going to stand this thing any longer." That she was positive as to the day, and the high tone of the voice. Counsel asked the court to note their exception to this evidence, because the same was not in rebuttal. The court replied that no objections had been made. Counsel for defendant then moved to exclude the evidence, because not in rebuttal. This the court refused to do. In this there was no error, because the court had the discretion to receive evidence until the argument was concluded, whether in rebuttal or not.

O. H. Gibson was permitted to relate to the jury a business transaction which he had with the defendant. The transaction occurred a few days before the homicide. Counsel for defendant objected, because the predicate laid by the testimony of the witness was not a sufficient basis to authorize an expression of opinion as to the sanity of defendant. This objection was overruled, and witness answered that, in his opinion, de-

fendant was then sane; that is, at the time of the transaction. To this bill of exceptions the learned judge appends the following explanation: "That said witness was asked his opinion as to defendant's sanity at the time of his conversation with him about the check on Wednesday before July 24, 1896, and witness detailed at length the facts upon which he based his opinion, as is set out in statement of facts much more fully than in this bill, and answered that, upon the facts detailed, defendant was, in his opinion, at that time, sane." We are not required to consult the statement of facts to verify the judge's statement. If counsel for the accused were not satisfied with this statement, they should have inserted in the bill of exceptions all that Gibson stated. But, if the testimony of this witness is looked at, it will be found that, though not an expert, he was qualified to give an opinion as to the sanity of the defendant. This is not like the Williams Case, 37 Texas Criminal Reports, 348. In that case no facts were stated by the non-experts as the basis of their opinion. Here the witnesses gave a very full detail of such facts.

R. A. Rutherford was permitted to give his opinion as to the sanity of the appellant. Counsel for appellant made the same objection to this witness as he did to the testimony of Gibson, above, and the learned judge gives the same explanation to the bill of exceptions. In regard to this bill we make the same observations as with reference to Gibson's testimony above, holding that he very clearly qualified himself to give an opinion on the sanity of the accused.

Counsel for appellant proposed to read certain excerpts from standard works on medical jurisprudence and the disease of insanity. The State objected, and the court sustained the objection, and defendant reserved his bill of exceptions. We have carefully read the brief of appellants on this phase of the case, and, while counsel seem very confident that the court committed an error in rejecting these excerpts, they cite no authority in support of their contention. We have no statute on this subject. The rules of evidence known to the common law of England must therefore prevail. What is the common law upon this question? In Reg. v. Crouch, 1 Cox, Cr. Cas., 94, the prisoner was indicted for the willful murder of his wife, and the defense set up was insanity. We quote the case in full: "Clarkson, for the prisoner, in his address to the jury, attempted to quote from a work, entitled 'Cooper's Surgery,' the author's opinions on the subject. Alderson, B., thought he was not justified in doing so. Clarkson: I quote it, my lord, as embodying the sentiments of one who has studied the subject, and submit that it is admissible in the same way as opinions of scientific men on matters appertaining to foreign law may be given in evidence. Alderson, B.: I should not allow you to read a work on foreign law. Any person who was properly conversant with it might be examined, but then he adds his own personal knowledge and experience to the information he may have derived from books. We must have the evidence of individuals, not their written opinions. We should be inundated with books if we were to hold otherwise. Clarkson: I shall prove the book to be one of high authority. Alderson,

B.: But can that mend the matter? You surely can not contend that you may give the book in evidence, and, if not, what right have you to quote from it in your address and do that indirectly which you would not be permitted to do in the ordinary course? Clarkson: It was certainly done, my lord, in M'Naghten's Case [10 Clark & F.]. Alderson, B.: And that shows still more strongly the necessity for a stringent adherence to the rules laid down for our observance. But for the noninterposition of the judge in that case, you would not probably have thought it necessary to make this struggle now." The case of Reg. v. Taylor, 13 Cox, Cr. Cas., 77, was another murder case. The deed was done by cutting the throat of the deceased in the presence of only a child about 9 years old. Counsel for the defense, in addressing the jury, set up insanity on the part of the prisoner, and proposed to read a case from Taylor's Medical Jurisprudence. .Brett, J., says: "That is no evidence in a court of justice. It is a mere statement by a medical man of hearsay facts of cases at which he was in all probability not present. I can not allow it to be read." In line with this common-law rule will be found the cases following: Ashworth v. Kittridge, 12 Cush., 193; Boyle v. State, 57 Wis., 472, 15 N. W. Rep., 827; Com. v. Wilson, 1 Gray, 337. We quote from Boyle v. State, supra, as follows: "Medical books can not be introduced in evidence, nor can an expert witness be permitted to testify as to statements made therein; and it is clearly inadmissible to permit the reading of such book to the jury by counsel." "In the trial of a criminal case, where the defense relied .on is the insanity of the defendant, neither books of established reputation on the subject of insanity, whether written by medical men or lawyers, nor statistics of the increase of insanity, as stated by the court or counsel on the trial of another case, can be read to the jury." Com. v. Wilson, 1 Gray, 337.

Counsel proposed to read the same excerpts from these standard works in explanation and elaboration of his argument. The court refused to allow this to be done, and defendant reserved his bill of exceptions. The authorities cited on the preceding question are in point, and, in addition, we cite People v. Wheeler, 60 Cal., 581; Insurance Co. v. Bratt, 55 Md., 200; Rog. Exp. Test., sec. 179.

Dr. Davis was placed upon the stand as a witness for the State, and after proving his.acquaintance, etc., with the defendant, he was permitted to testify that the defendant was simulating; that is, playing a part, and not acting naturally. This was objected to by defendant, "because immaterial, and it would throw no light to the jury by which to read a solution of the question of guilt or no guilt in defendant as to the issue before the jury, to wit, sanity or no sanity in the defendant on the 24th of July, 1896, the day of the alleged offense for which defendant was on trial; that simulation or no simulation at this time, and in the present surroundings of defendant, would not help to aid the jury in determining whether this defendant was sane or insane on the 24th day of July, 1896, when the offense for which he is on trial was alleged to have been committed. All objections were overruled, and the exception reserved." The learned

judge qualifies this bill of exceptions by stating "that the witness testified that he had carefully observed the defendant and his demeanor during the trial, which had lasted about seven days; that he had qualified himself as an expert previously; and that the defendant himself had offered in evidence the manner and appearance of the defendant, the way he demeaned himself during the trial, as an evidence of his insanity at the time of the trial. The defendant had demeaned himself quite unusual to an ordinary individual on such a trial, and under these circumstances the evidence as to whether or not he was then intentionally trying to play a part or simulate insanity was admitted, and this question was put to witness after the hypothetical question stated in other bills had been answered by him." From this explanation it appears that the appellant entered this field of evidence by offering testimony of his manner and appearance and demeanor during the trial, as evidence of insanity at that time. Unquestionably, the State could follow him, and introduce evidence as to this same matter. It was evidently the purpose of the appellant, when introducing this evidence, to convince the jury that, as he was then insane, the probability was that he was insane at the time of the homicide. The court was clearly right in admitting this testimony.

The hypothetical question was also submitted to this witness, and he answered that, in his opinion, the defendant was sane on the 24th day of July, 1896. The objections here raised are the same as those presented with reference to the hypothetical question submitted to Dr. Wooten, and treated in this opinion above, and therefore we will not go over this discussion again.

It appears from a bill of exceptions that, at the request of appellant, Dr. Wooten and others went to the jail, and took the dimensions of the skull of the defendant, and, while there, examined the defendant, talked to him, looked at him, and observed him. The State proved by Dr. Wooten that it was his opinion that defendant was sane at that time. This bill of exceptions refers us to the statement of facts. When we consult the statement of facts, we are clearly of the opinion that the observations of defendant by Wooten were amply sufficient to warrant him in giving an opinion and there was no error in admitting his testimony. Another bill of exceptions was reserved to the testimony of Dr. Wooten as an expert as to the sanity of the defendant, but, when considered in the light of the explanation of the trial judge, it presents no error whatever.

Jack Hughes was placed on the stand for the State, by whom it was shown that he had noticed the fact that the defendant had struck his head against the window frame the day before, as he passed through the window, and that it was the only time the defendant had done so in the many times he had passed through said window during the trial. It appears that the defendant had offered in evidence the appearance of himself during the trial, his manner of coming in and going out of the courtroom, etc., as shown by the statement of facts. This presents the

same question that we have discussed above in relation to the defendant simulating insanity. We find no error in this matter.

After proving by Dr. Smoot that he was 50 years of age, a minister of the gospel, and, as such, serving the Presbyterian Church in the city of Austin for twenty years, and that he had read some authors on moral and intellectual science, but nothing on insanity or medical jurisprudence, the appellant proposed to prove by him that, in his opinion, the defendant was insane on the 24th of July, 1896, the day the offense is alleged to have been committed; and the State objected, because Dr. Smoot was not an expert. The court refused to permit the witness to testify on this phase of the case, and we think the ruling was correct. This witness was offered as an expert, when in fact he was not an expert. It was not proposed to prove his opinion as to whether defendant was sane or insane from what he knew of the defendant, his associations with him, etc., but simply to obtain his opinion as an expert.

We are not informed of any case holding that because a prisoner is in jail, unwarned, therefore his conduct can not be observed, so that the expert can give an opinion as to his sanity. It would be a remarkable case, indeed, in which the accused, if insane, would simulate sanity. We can not comprehend how the fact that he was in jail could affect his conduct in this particular in any manner, and therefore the ruling of the court in regard to the testimony of Dr. M. M. Smith was correct. See Adams v. State, 34 Texas Crim. Rep., 470.

The matters contained in the bill of exceptions in reference to the testimony of Dr. Goodall Wooten have been disposed of in treating of the bill of exceptions relating to the testimony of Dr. Wooten, hereinbefore discussed.

The objection to the testimony of R. E. White, sheriff, is not well taken. He had warned the defendant, and, after being warned, anything that the defendant stated to him was admissible, and he had a right to give his opinion as to the sanity of the defendant. Having stated detailed conversations, facts, acts, and his observations of the defendant, he was qualified to give an opinion. In addition to this, we will not be forced to peruse the statement of facts in order to ascertain whether the witness qualified himself or not. As before stated, it is the duty of counsel for appellant to set forth the facts in the bill of exceptions. But, to satisfy ourselves that the learned judge acted properly, we have examined the testimony of this witness in the statement of facts, and find him qualified as a witness.

Objection was made to the charge of the court. We think the charge is an admirable one. It was the duty of the court, in defining murder in the first degree or murder upon express malice, to charge the jury: "Do the facts and circumstances in this case show such a reckless disregard of human life as necessarily includes a formed design against the life of the person slain? If they do, the killing, if it amounts to murder, would be upon express malice." This charge is amply supported by a number of authorities. If sane, it would be almost morally impossible for the

homicide to be committed, under the circumstances in this case (the prisoner having slain his own wife and two little children) without it being upon express malice. This homicide, with its attending circumstances, evinces a reckless disregard of human life, which is the conclusive evidence of express malice. There was no passion attending this homicide, and the defendant's mind was in the same condition when he killed his wife as it was when he killed his two little children. We are of the opinion that the charge is eminently correct when viewed as a whole.

A number of methods, modes, and instruments were alleged to have been used in the perpetration of the crime. The indictment alleges that it was "by then and there striking, beating, and wounding the said Anna M. Burt upon her head and face, with a hatchet and some heavy instrument, a better description of which the grand jurors are unable to give, thereby fracturing the skull and the bones of the face of the said Anna M. Burt, and by then and there tying tightly around the throat and neck of said Anna M. Burt a handkerchief, thereby strangling and suffocating the said Anna M. Burt, and by then and there wrapping around the head and body of said Anna M. Burt a blanket, and securely tying same thereon with rope, and then and there throwing said Anna M. Burt, so wrapped and tied, in a cistern partially filled with water, sufficient to submerge the body of said Anna M. Burt." This indictment is correctly drawn. Where there is doubt about how the death was produced, it is well to put every means suggested by proof in the indictment; and, if proof be made of one of the means, it is unnecessary to prove them all. It is not necessary to cite any authority to sustain this proposition.

If there was any error in the charge of the court, it consists in the fact that the court submitted murder in the second degree to the jury. We believe this practice, however, to be correct, prudent, and safe. The charge upon this subject is the law, not obnoxious to any objection.

The court gave the usual charge in regard to the burden of proof applicable to a case in which the accused relies upon insanity, charging that the burden was upon the accused to show his insanity. My opinion upon this subject has been expressed, and I can add nothing to what I have said, in the King Case, 9 Texas Criminal Appeals, 515; but the majority of this court hold that the charge upon this subject as submitted to the jury in this case is correct. The rule in Texas is unbroken in support of the charge as given in this case upon the question of insanity. If the burden is upon the defendant to etablish insanity, he is not entitled to reasonable doubt upon this proposition. If the burden be upon the State, then he might claim that the State should be required to establish sanity beyond a reasonable doubt; but, being upon him, he must discharge the burden, and satisfy the jury that he was insane. He need not do this beyond a reasonable doubt, but this must be done.

Counsel for appellant insist that, notwithstanding the enormity of the acts imputed to appellant, yet he was entitled to a fair and legal trial, and that, if he has not had such trial, the judgment should be reversed.

We indorse this proposition to the fullest extent, and, if we believed that any error had been committed in this trial in the least calculated to prejudice the rights of the accused, we would not hestitate to say that the judgment should be reversed; but we are of opinion, after a careful examination of this record and close attention paid to the argument of the learned counsel for the defense (than whom we have no superior), that the appellant has received a fair and legal trial. The question of fact whether the appellant was sane or insane was submitted to the jury. The evidence is conflicting. We are of opinion, however, that the great weight of the testimony is in favor of the sanity of defendant; but be this as it may, the jury has settled the question, and we think they have settled it properly.

We are of opinion that the judgment should be affirmed, and it is accordingly so ordered.

*Affirmed.*

### MOTION FOR REHEARING.

And now comes appellant, W. E. Burt, and moves the court for a rehearing in this case, and for grounds for motion shows to the court:

1. The court misconstrued the record on the first ground discussed by the court and urged by appellant for a reversal of the case, viz., that growing out of the hypothetical question put to the expert witness, Dr. Wooten, by the State; in that the statement in the opinion is not borne out by the record, as will be more fully set out in the accompanying statements and arguments.

2. The court erred in not sustaining appellant's contention growing out of bill of exceptions 3, in that the court does not deal with the real question that springs therefrom, but confines itself to only one question, and leaves undiscussed and undecided the main question, viz., whether the testimony objected to was admissible against defendant as original evidence, and whether, if not, it should not have been withdrawn on the motion of defendant so to do.

3. The court erred in not sustaining the objection to the testimony of O. H. Gibson, as made by bill of exceptions number 1, subdivision 2, because his acquaintance with appellant was not of that full and intimate character which would authorize him to give an opinion on facts. The substance of what he testified as to facts was embraced in the bill, and this court was misled by the qualification of the trial judge to said bill by his referring to the statement of facts, and the court was in error in not turning to the statement of facts when reference is made thereto in any part of the bill. Penal Code, art. 686; Rev. Stats., art 1362.

4. The court erred in like manner in regard to the question raised over the evidence of R. A. Rutherford and for the same reason as raised in subdivision 1 of bill 1.

5. The court erred in not sustaining the objections to the testimony of Dr. Davis as shown by bill of exceptions number 4, because the court in the first place misconstrues the record, and consequently misstates the conditions surrounding the status of the case, when the question as to simulation of appellant during the trial was put by the State. Defendant had never "entered the field of evidence by offering testimony of his manner, appearance, and demeanor during the trial, as evidence of his insanity at the time." The court was misled by something that is not in the record; and second, the court fails to discuss or decide the questions springing from said bill in regard to the hypothetical case or question put to said witness. This court is in fatal error when it parallels the question arising from bills taken to the testimony of Drs. Wooten and Davis. A moment's glance at them demonstrates the difference. The Wooten bill (number 2) is made to speak through the qualification thereof by the court, viz: He makes the same qualification to this bill as he does to the bill taken as to the Dr. Davis testimony, and then proceeds: "The State, after asking a hypothetical question based on her testimony, further asked the witness his opinion based upon a hypothetical case, embodying all the evidence in the case." The qualification to the Davis bill, number 4, was as follows: "And the court stated to counsel that the State would be allowed to state a hypothetical case, based upon the assumption that her testimony was true, and embracing all the evidence for the State, and to ask the opinion of the witness based upon such hypothesis, and that the defendant would be allowed to state a hypothetical case, based upon the assumption that his testimony was all true, and on all reasonable inferences to be drawn from such testimony, and to express his opinion upon such hypothetical case. The State embraced all its testimony in its hypothetical question, and upon the assumed truth of said question the witness stated in his opinion that the defendant was sane. The defendant then put his hypothetical case to the witness based upon the assumption that all of his testimony was true, and based on the assumption that all reasonable inferences to be drawn from his testimony were true, including the fact that defendant, without motive, reason, or cause, killed his wife and children, upon which question witness answered that upon such hypothesis the defendant was insane. All the evidence was embraced and included in the State's hypothetical question and defendant's hypothetical question combined.

6. The court erred in holding that the examination of Dr. Thomas D. Wooten of defendant in the jail, when his sole business there was to measure his head, was sufficient to authorize him to speak as to the mental condition of the defendant four months before.

7. The court erred in holding the testimony of Jack Hughes admissible in presence of bill of exceptions taken concerning same.

The court misapprehended the conditions surrounding the case at the time, and gives reason for its decision of this point that are not in the record, viz., that defendant had entered into the domain of testimony to show that he was insane during the trial.

8. The court misapprehended the record in discussing the question raised by bill in regard to the witness Dr. Smoot. He was used as a lay witness, and then sought to be used as an expert when the bill arose.

9. The court erred in sustaining the charge of the trial court, wherein the court charged that the jury might infer express malice if the killing and the manner of it showed a reckless disregard of human life.

This not being a killing where such a charge has a place, it is not believed that this part of the decision was well considered. The charge is a misapplication of the law, and was ruinous to defendant on trial.

10. The court erred in failing to pass on subdivision 11 of the court's charge, where the court uses the language: "Or if the said defendant did with malice aforethought so kill said Anna M. Burt," which defective charge was expressly arraigned as authorizing a verdict of murder in the first degree, on implied malice, that is, malice aforethought, and not express malice aforethought. The court failed to consider said error.

The said error in the charge was fatal to defendant. It allows of no construction save that given it by the defendant, viz., to convict him of murder in the first degree on implied malice, and the court erred in not so holding and reversing the case therefor.

The court erred in not holding that it was not error in the trial court, in holding in its charge that where insanity is set up as a defense the burden of proof is not on the State but on the defendant.

The court further erred in upholding the charge of the trial court which placed the burden of proof on the defendant, on the issue of insanity, because the statutes of Texas provide that the rules of evidence known to the common law, in respect to the proof of insanity shall be observed in all trials where that question is at issue, and the rule of the common law on that subject, as declared by the Supreme Court of the United States, a common law court, is that the burden of proof in such cases is on the State; that such decision of the Supreme Court is of the dignity of a law, is the supreme law of the land, and appellant claims the benefit and protection thereof. Vide section 40, Penal Code of Texas, and Davis v. United States, 160 U. S., 469. And yet further, because the upholding of said charge, which compelled appellant to labor under the burden of proving his insanity on his trial, was in violation of article 5 of the amendments of the Constitution of the United States, and also of section 1, article 14 of the amendments of the Constitution of the United States, and is such a gross error as to amount, and does amount, to a denial of a fair and impartial trial under due process of law; in this:

(1.) It shifted from the State, upon which same always rests, the burden of proof of criminal charge against appellant, and in effect requires him to establish his innocence (irresponsibility) for an offense of which he had not been proven guilty; until he was beyond a reasonable doubt proven guilty of some crime, he was presumed to be innocent thereof.

(2.) It abridged his immunity, as a citizen of the United States in that behalf, i. e., to be presumed innocent until the State had proven, beyond a reasonable doubt, against him every material element, including

his sanity or mental responsibility necessary to establish the offense with which he was charged.

(3.). It deprived or tended to deprive him of his life without due process of law; and,

(4.) Denied to him the equal protection of the law; for it required him to disprove an offense not yet proven against him, a burden not imposed on appellant equally with all other persons charged with crime under the laws of the State of Texas.

In view of all the facts—the gravity of the questions involved—the importance of their right decision to appellant—being no less than his life—he asks that his counsel may orally argue this motion, and that a rehearing may be granted to him.

[NOTE.—This motion was supplemented by a most able brief and argument upon all the points submitted, which, owing to its length, can not be reproduced, to the regret of the Reporter.]

### ON MOTION FOR REHEARING.

HURT, PRESIDING JUDGE.—The judgment in this case was affirmed at the Austin term, 1897, of this court, and the case comes before us now on motion for rehearing by the appellant.

In the original opinion we discussed the question as to whether or not expert opinion could be obtained upon a partially stated hypothetical case, this question being discussed with reference to the bill of exceptions in regard to the testimony of Dr. T. D. Wooten. The same subject was presented in a bill of exceptions in regard to the testimony of Dr. Davis. We disposed of the question presented in the bill of exceptions with reference to the testimony of Dr. Davis by reference to what we had said in regard to the bill of exceptions as to Dr. T. D. Wooten's testimony. Counsel for appellant, on motion for rehearing, insists that there is a very material difference in the bills of exception. From the record it appears that Dr. Wooten was introduced by the State, and a hypothetical case submitted to him, and that this question did not include all of the evidence bearing upon the question of sanity. Dr. Wooten answered the question that, in his opinion, defendant was sane. Afterwards the State asked the witness his opinion based upon a hypothetical case embodying all the evidence in the case, upon which the witness expressed the same opinion as upon the State's first question; that is, that appellant was sane. Appellant then put a hypothetical question to the witness based upon his theory of the case, and upon which the witness answered that the defendant was insane. A full opportunity was allowed to get the opinion as to the defendant's sanity based upon any hypothesis to be inferred from any evidence in the case. The objection to this procedure was that the State obtained the witness' opinion upon an incomplete hypothetical case. Let us concede for the argument that the full case, containing all the testimony, offered either by the State or the defendant, must be embraced in

the hypothetical case; still, if this was not done, no complaint can be urged by appellant in regard to the testimony of Dr. Wooten, because after the defendant had submitted his hypothetical case, the witness answered that, in his opinion, the appellant was insane. Upon no ground of reason or common sense could appellant be heard to complain of this matter in the shape presented by this bill. Appellant was permitted to form a hypothetical case, not alone upon his testimony, but upon any and all the testimony introduced upon the trial. When the whole case was put, the witness answered that his opinion was that defendant was sane. When the defendant's case, based upon the testimony offered by him, was put to the witness, he answered that defendant was insane. But it will be observed that the bill shows that the State submitted the whole case, and upon which the witness answered that defendant was sane. We can not comprehend how appellant can complain of this. As to the contention of appellant that the opinion was only upon a partial or incomplete statement of the case, we will treat of this subject when we reach the bill of exceptions pertaining to the testimony of Dr. Davis.

It occurs by a bill of exceptions that Dr. Davis was introduced as an expert; that the State submitted a hypothetical case based upon its testimony bearing upon the question of sanity, and obtained the answer that appellant was sane. The defendant objected, because all the testimony bearing upon the question of sanity was not embraced in the hypothetical case put by the State; but the bill further shows that the defendant then put a hypothetical case to the witness, based upon the assumption that all reasonable inferences to be drawn from his testimony were true, including the fact that defendant, without reason, motive, or cause, killed his wife and children, upon which question the witness answered that, upon such hypothesis, he would say that the defendant was insane; that all of the testimony bearing upon the question of sanity was embraced in the State's hypothetical question and the defendant's hypothetical question combined.

We have presented to us the question discussed in the original opinion, in treating of the bill of exceptions pertaining to the testimony of Dr. Wooten, which is: Can the State submit a hypothetical case which does not include all the testimony bearing upon the question of sanity, and obtain an opinion from the expert; or must the question propounded contain all the evidence bearing upon the question of sanity, whether introduced by the State or the defendant, and whether believed to be true or false by the State? We hold, as we did in the original opinion, that the State can formulate a hypothetical case embracing such facts bearing upon the question of sanity as it deems proper and competent, and obtain the opinion of an expert. We hold that, if the defendant is not satisfied with the hypothetical case submitted by the State, he has the privilege of submitting his case, not only as embraced in his testimony, but upon any and all testimony introduced on the trial. Of course, if the case submitted by the State is unfair and unjust to the appellant, the court will correct this; and if the court fails to do so, and the defendant proposes to

submit a case embracing all the facts bearing upon the question, and he is denied this right, error would be patent.

Recurring to the bill of exceptions pertaining to the testimony of Dr. Wooten: If the last proposition be correct, the State was under no obligation, and was not required to submit the full case, but had the right to submit the case which it thought was supported by the testimony, and was not bound to submit a case involving testimony believed by the State to be false. And we repeat that the disposition of the bill of exceptions as to Dr. Wooten's testimony disposes of the bill of exceptions as to the testimony of Dr. Davis; for, if the State is not bound to embrace all the testimony bearing upon the subject, then it was not required to do so in reference to Dr. Wooten, but after having done so, appellant had no right to complain.

Now, we have this question: Is it necessary, in submitting a hypothetical case, for the State to include every particle of the evidence bearing upon the question of insanity, in order to obtain a legal answer from the expert? If so, the contention of the appellant in the Davis bill of exceptions is well founded; for that bill shows that the opinion was obtained from the expert upon a hypothetical case that did not embrace the theory of the defense, and did not embrace all the testimony bearing upon the question of sanity. The question therefore is: Must the hypothetical case submitted to the expert include all the testimony bearing upon the question of sanity, in order to obtain a legal and proper answer from the expert? In the original opinion we discussed this very question, and held that it was not necessary. We have seen nothing to change our opinion upon this subject. The authorities are just that way. But it is contended by counsel for appellant that we have settled the law to the contrary in Webb v. State, 9 Texas Criminal Appeals, 490; Leache v. State, 22 Texas Criminal Appeals, 279, and in Williams v. State, 37 Texas Criminal Reports, 348.

Now, we assert that the question here discussed has never been presented in any case before either the Court of Appeals, Court of Criminal Appeals, or the Supreme Court of this State. Counsel for appellant cites no case decided by the Supreme Court, but relies upon the cases of Webb v. State, Leache v. State, and Williams v. State, supra. What was the question before the court in Webb v. State, supra? It was as to whether or not an expert could give his opinion unless he had heard all the testimony bearing upon the question at issue. It was not a case in which the hypothetical case was submitted to an expert who had not heard the evidence. The question arose in this manner: Dr. Stone, witness for the defendant, heard all the testimony introduced on the trial, and gave as his opinion that he had heard no evidence of the insanity of the accused that could not be explained by other causes, such as indulgence in drink or debauchery. The State, upon cross-examination of Dr. Stone, asked what his opinion was, based upon the testimony of the witness Pool. Dr. Stone answered that from the evidence of Pool alone he would have considered Webb insane, and believed the mind of defendant, at the time the

particular offense was committed, to be more or less disturbed from some cause, but not to the extent to relieve him entirely from responsibility. In passing, the court say "that the witness had heard all the testimony in the case, and did not believe the defendant insane. This opinion, founded upon the whole testimony, must have included, and did include, the testimony of the witness Pool. If it did, then how could any injury result to defendant by asking, and that, too, upon cross-examination, the opinion of the witness upon the testimony of Pool alone, we confess we can not conceive. It would have been otherwise if the expert had not heard and formed his opinion upon the whole case; for in that case the question and answer would nave been not only improper, but illegal and inadmissible." Now, it will be observed that in the Webb Case the hypothetical question was not propounded to an expert who had not heard the testimony, but the expert had heard all the evidence. It may be insisted that, if it is necessary for the expert to hear all the testimony before giving an opinion, therefore it is absolutely necessary that the hypothetical case submitted to an expert who did not hear the testimony must embrace all the testimony bearing upon the question of sanity. We are not called upon to pass upon this question; but the reasons for the one rule will not apply to the other rule. Take the most enlightened expert, and let him hear all the testimony; he can arrive at a correct conclusion as to the sanity of the accused; and at the same time, if called upon to state all the facts from which he makes the conclusion, he would most generally fail. The impression from the facts is made upon his mind, without the ability to produce the facts in the statement. But, be this as it may, the question involved in the Webb Case is not the question before us. Now, it is true that Presiding Judge White in that case states that the full case must be submitted, and he asserts that all the authorities support this proposition. We find to the contrary, that the overwhelming weight of authority supports the proposition "that the State has the right to submit its hypothetical case, and, if the accused is not satisfied with it, he can state his hypothetical case." This proposition is conclusively established by the authorities cited in the original opinion; and, in addition to those, we desire to cite the elaborate opinion in the case of Coyle v. Commonwealth, 104 Pennsylvania State, 117. To be more explicit: "Each side has the right to an opinion from the witness upon any hypothesis reasonably consistent with the evidence; and, if meagerly presented in the examination on one side, it may be fully presented on the other, the whole examination being within the control of the court, whose duty it is to see that it is fairly and reasonably conducted." Now, the question presented to us is one in which the State presented its theory of the hypothetical case to the expert. (We are now treating of the bill of exceptions in reference to Dr. Davis' testimony.) The State had a right to select its theory of the evidence, and to base a hypothetical case upon that state of facts which the State thought to be true. The defendant had a right to submit a hypothetical case upon the state of facts which he believed to be true. Of course, if the statement of a hypothetical case for

the State was unfair and unjust to the appellant, and objections had been raised, the court would have controlled this matter; but that does not appear in this case. It would be almost impossible for the State to embrace all the testimony introduced in evidence in the hypothetical case, without impressing the jury with the fact that the State believed that all of the evidence and circumstances embraced in the case were in fact true. This would be a great injury to the State. It would be in the nature of a concession of facts which the State proposed to controvert. Nor would it be just to the defendant to require him to embrace all the facts in his statement—those which tended to show sanity as well as insanity—when he did not believe the testimony, and in fact proposed to impeach the witnesses swearing to the facts tending to show sanity in some manner, or to show that they were unreasonable and not in fact true. The record shows that a very full statement was made by the State presenting its theory of the facts believed to be true; and the record also shows that the defendant presented his theory of the case. This being so, the expert was in possession of the whole case as effectually as can be presented practically upon a trial of a case.

In the Leache Case, supra, the question was in regard to placing the experts under the rule. It appears from the record that the experts were placed under the rule, and did not hear the testimony of the other witnesses. Leache contended that this was reversible error; that he had the right to have the experts present, so that they might hear the testimony in order to give an opinion. Presiding Judge White states "that it was not shown that the hypothetical case presented to the expert was defective in not submitting all the facts essential to an intelligent opinion; nor that the opinion was such as would have been given differently had the evidence been heard directly by these witnesses, and their conclusions drawn from it, and not from the hypothetical statements of it. We can not perceive that the discretion of the trial judge was abused in the matter to the prejudice of the defendant; that is, that, in placing the experts under the rule, no prejudice therefrom was shown to have resulted to the appellant." That was the only question in judgment. The remarks of Judge White in regard to the rule were not called for or necessary to the disposition of the question raised; but he states, relying upon Coyle v. Commonwealth, 104 Pennsylvania State, 117, "that, where the expert has not heard the evidence, each side has the right to an opinion from the witness upon any hypothesis reasonably consistent with the evidence; and, if meagerly presented in the examination on one side, it may be fully presented on the other, the whole examination being within the control of the court, whose duty it is to see that it is fairly and reasonably conducted." The question involved in the Leache Case, supra, was simply the action of the court in putting the experts under the rule, and all of the observations made by the presiding judge in regard to the rules which control in submitting hypothetical cases to an expert were dicta. But he concedes that each side has the right to an opinion from the witness upon any hypothesis reasonably consistent with the evidence. This concession

is made in the face of the assertion that all authorities agree that it is inadmissible to permit an expert to give his opinion upon anything short of all the evidence in the case, whether he has personally heard it, or it is stated to him hypothetically.

In the Williams Case, supra, the only question before the court was as to the admissibility of the testimony of Dr. Armstrong, an expert, who testified that he had heard but a part of the testimony, but had read the newspaper account of the testimony of the witnesses on the question of insanity on the previous trial of the case. The court thereupon stated that the testimony was the same in the present trial, and permitted the witness, over the objections of appellant, to give an opinion as to the sanity of the defendant. We held in that case that the newspaper report was nothing but hearsay testimony, and that it was not competent for the judge to put such a hypothetical case to the witness. We stated, further, that, if the newspaper statement was eliminated, the witness was not authorized to give his opinion based only on having heard a part of the testimony of the witnesses. So the question here presented was not raised in said case, and what was said by us in referring to the Webb and Leache Cases, supra, was not at all necessary to that decision.

We misunderstood the bill of exceptions reserved to the testimony of Carrie Sparks. We thought that the only objection urged to this testimony was that it was not in rebuttal; but, since our attention has been called to the bill in the motion for rehearing, we find that the appellant moved to exclude the evidence upon the grounds, condensely stated, of irrelevancy, that appellant was not shown to have been in the house, and a number of other objections. We therefore have the question as to whether or not, under the circumstances of this case, the evidence of this witness was admissible. When we look to the record, we find that the circumstances strongly tended to show that the appellant was at home. The evidence places Mrs. Burt there, as well as defendant, a short time after the expression was heard. This being the case, we are of opinion that the testimony was admissible, and have no doubt of its relevancy. It was conceded in the argument of appellant's counsel that defendant killed his wife and two children. About this there is no question. But it is contended that the evidence of this witness bears strongly on the question of sanity. We do not understand it in that way. The testimony shows that Mrs. Burt exclaimed, "I will stand this thing no longer!" To what "thing" she alluded is not disclosed. Whether it was the ill treatment of the husband, or whether it was the insane conduct of the defendant, is not shown. The exclamation may have been made because of the strange and unnatural conduct of an insane man, or might have been induced by the ill treatment of appellant towards his wife. We are left in the dark upon this subject. This exclamation could not have been made by the servant, for she was not at home; and the evidence shows no other female there except Mrs. Burt. Appellant insists, however, that the evidence fails to show that Burt was at home. The witness heard the ex-

clamation after 7 o'clock in the evening. It is shown that defendant was there between 8 and 9 o'clock. The exclamation was made at his home, and the conclusion is reasonable that it was made by his wife to him. Be this as it may, appellant concedes, and the unquestioned facts of the case demonstrate that he killed his wife and children. We might admit, but we do not, the incompetency of this evidence; and yet no possible injury could have resulted to appellant. It is a strained conclusion that the remark made by the female in the house tended to show the sanity of defendant, for, as before stated, it might have resulted from the insane act of the appellant. If the jury believed, as they had a right to believe, that the exclamation was made by the appellant's wife to defendant, clearly the evidence was admissible. If they did not so believe, then no harm resulted to the appellant. If the jury believed that the appellant was insane, or had a doubt about it, they may have concluded that the exclamation was made by the wife, because of some misconduct of her deranged husband, or, if they did not believe he was insane, that the remarks were made because of the ill treatment of the defendant. We are left in a field of speculation, but we can not perceive, conceding the inadmissibility of the testimony for the argument, how, under the facts of this case, appellant could have been injured; that he killed his wife and children being a conceded fact. Now, it must reasonably appear that the exclamation testified to by the witness Sparks tended to show sanity; and nothing else; and, unless this is made to appear, no injury could have resulted. But we are of opinion that the evidence was admissible, independent of these considerations.

The court instructed the jury upon the subject of express malice as follows: "(6) Express malice, which is absolutely essential to constitute murder in the first degree, exists where one, with sedate, deliberate mind and formed design, unlawfully kills another. (7) When an unlawful killing is established, the condition of the mind of the party killing, at the time, just before and just after the killing, is an important consideration in determining the grade of the homicide; and, in determining whether murder has been committed with express malice or not, the important questions for a jury to consider are: Do the facts and circumstances in the case at the time of the killing, and before and after that time, having connection with or relation to it, furnish satisfactory evidence of a sedate and deliberate mind, on the part of the person killing, at the time he does the act? And do these facts and circumstances show a formed design to take the life of the person slain, or to inflict on him some serious bodily harm, which, in its necessary and probable consequences, may result in his death? Or do the facts and circumstances in the case show such a general reckless disregard of human life as necessarily includes the formed design against the life of the person slain? If they do, the killing, if it amounts to murder, will be upon express malice. (8) In order to warrant a verdict of murder in the first degree, malice must be shown by the evidence to have existed; that is, the jury must be satisfied from the evidence, beyond a reasonable doubt, that the killing was a

consummation of a previously formed design to take the life of the person killed, and that the design to kill was formed deliberately with a sedate mind—that is, at the time when the mind of the person killing was self-possessed and capable of contemplating the consequences of the act proposed to be done. There is, however, no definite space of time necessary to intervene between the formed design to kill and the actual killing. A single moment of time may be sufficient. All that is required is that the mind be cool and deliberate in forming its purpose, and that the design to kill is formed while the mind is in such calm and sedate condition. (9) When the evidence satisfies the mind of the jury, beyond a reasonable doubt, that the killing was the result of a previously formed design by the defendant to kill deceased, and that the design was formed when the mind was calm and sedate, and capable of contemplating the consequences of the act proposed to be done by him, and such killing is further shown to have been unlawful and done with malice, then the homicide is murder in the first degree, and your verdict should be rendered accordingly. (10) To warrant a conviction of murder in the first degree, the jury must be satisfied by the evidence, beyond a reasonable doubt, that the defendant, before the act, deliberately formed the design with a calm and sedate mind to kill the deceased; that he selected and used the weapon or instrument or means reasonably sufficient to accomplish the death by the mode and manner of its use. The act must not result from a mere sudden, rash, and immediate design, springing from an inconsiderate impulse, passion, or excitement, however unjustifiable and unwarrantable it may be. (11) Now, if you believe from the evidence, beyond a reasonable doubt, that the defendant, Eugene Burt, in Travis County, State of Texas, on or about July 24, 1896, as charged in the indictment, unlawfully, with malice aforethought, with a sedate and deliberate mind and formed design to kill, did kill Anna M. Burt, by then and there striking, beating, and wounding the said Anna M. Burt upon her head and face with a hatchet and some heavy instrument, thereby fracturing the skull and the bones of the face of said Anna M. Burt, and by then and there tying tightly around the throat and neck of said Anna M. Burt a handkerchief, thereby strangling and suffocating the said Anna M. Burt, and by then and there wrapping around the head and body of said Anna M. Burt a blanket, and securely tying same thereon with rope, and then and there throwing said Anna M. Burt, so wrapped and tied, in a cistern partially filled with water, sufficient to submerge the body of said Anna M. Burt; or if the said defendant did, with malice aforethought, so kill said Anna M. Burt, by either one or by all of the means above enumerated—you will find the defendant guilty of murder in the first degree, and so state in your verdict, and fix his punishment at death or confinement in the State penitentiary for life, as you may determine and state in your verdict."

Counsel for appellant objects to that portion of the charge which reads as follows: "If the said defendant did, with malice aforethought, so kill said Anna M. Burt, you will find the defendant guilty of murder in the first degree." It is insisted that this charge authorized a verdict of murder

in the first degree, upon a state of case which demanded a verdict of murder in the second degree. We do not so understand the charge. It has reference directly to the preceding portions of the charge, which in a remarkably clear and explicit manner define murder in the first degree. No juror with the least degree of intelligence, under the charge given in this case, could conclude that the verdict of murder in the first degree could be rendered unless it was established beyond a reasonable doubt by the evidence that the accused, with a calm mind and formed design, deliberately killed his wife. This portion of the charge has reference to the charge preceding it, and, when it says "so kill," it means, and of necessity means, in the manner and condition of mind as set forth in the preceding portions of the charge. However, there was no objection to the charge; and, this being the case, the rule is that it must have been calculated to injure the rights of the accused. This proposition is supported by any number of cases, the leading case being Bishop v. State, 43 Texas, 390. Tested by this rule, was appellant injured? As we said in the original opinion, there is no murder in the second degree in this case. The learned counsel of appellant, in argument, admitted that, if the accused was sane, he was guilty of murder upon express malice. If this be true—and it is absolutely true—then no possible injury could have resulted from this charge, if the appellant's construction be correct.

It is insisted by counsel for appellant that, if we affirm this judgment, it will be contrary to law, and contrary to the previous decisions of this court. If contrary to law, this judgment ought not to be affirmed. If contrary to previous decisions, and those decisions are wrong, being correct in all other respects, the judgment ought to be affirmed. It is not contended by counsel that a change of opinion has wrought a legal injury to appellant, in misleading him so as to deprive him of a legal defense. Nothing of this sort is intimated. We have discussed the cases referred to by appellant in which he insists that we have laid down a different rule in regard to the testimony of an expert. We have shown that no case contains the question here raised. We have shown that in the Webb, Leache, and Williams Cases, supra, the observations of the court were mere dicta. But concede, for the argument, that this court has changed its opinion (which is not the case); if we are correct now, the appellant has no right to complain, he having been misled in no manner calculated to deprive him of a legal defense. But, as we have before observed, the question in regard to the manner of obtaining the opinion of an expert has never been presented to this court in the shape presented in this case. There has been no change of opinion, but there has been dicta, which is not supported by the authorities. We have given this record a most careful examination, in the light of the consequences of the verdict, and are thoroughly aware of the fate pending over the appellant, and would not hesitate to reverse the judgment if we thought appellant had been deprived of a legal right; but we have found nothing in the record tending remotely to show that appellant has been deprived of a legal right. The evidence is amply sufficient, in fact, conclusive of the guilt of the ac-

cused; the verdict of the jury is supported beyond all question by the evidence; and we have found nothing in the record authorizing this court to reverse the judgment.

The motion for rehearing filed by appellant is overruled, and the judgment affirmed.

*Motion overruled and judgment affirmed.*

DAVIDSON, Judge.—I concur in the conclusions reached by the presiding judge. As to whether the bill of exceptions in regard to the testimony of the expert witness Dr. Davis is complete, so as to raise the question at issue, I simply quote the qualification of the trial judge to said bill: "The evidence in the case was very voluminous, and in part contradictory. The fact of the killing itself, relied on by the defense as one of its strongest, if not only, ground showing insanity, was one of the disputed facts in the case, provable only by circumstances, and it was impossible to form a hypothetical case assuming all the evidence in the case to be true, because there was no direct evidence of the killing, and said testimony was contradictory in part; and the court stated to counsel that the State would be allowed to state a hypothetical case based upon the assumption that her testimony was true, and embracing all the evidence for the State, and to ask the opinion of the witness based upon such hypothesis; and that the defendant would be allowed to state a hypothetical case based upon the assumption that his testimony was all true, and on all reasonable inferences to be drawn from such testimony, and to express his opinion based upon such hypothetical case. The State embraced all its testimony in its hypothetical question, and, upon the assumed truth of said question, the witness stated his opinion that defendant was sane. The defendant then put its hypothetical case to witness based on the assumption that all his testimony was true, and based on the assumption that all reasonable inferences to be drawn from his testimony were true, including the fact that defendant, without reason, motive, or cause, killed his wife and children, upon which question witness answered that upon such hypothesis he would say the defendant was insane. All the evidence was embraced and included in the State's hypothetical question and defendant's hypothetical question combined." It will be seen from this statement of the judge that two hypothetical questions were stated—one based upon the evidence for the State, and the other based upon the evidence for the defendant. The expert witness answered upon the State's hypothetical question that the defendant was sane, and upon the hypothetical question put by the defendant that he was insane. Taking these answers, we are forced to the conclusion that the testimony was not only incongruous and contradictory, but led the mind of the expert to two different conclusions. Under such a state of case, it is evident that a hypothetical case embracing all the facts adduced on the trial in this respect could not be answered by the witness without first having decided in his own mind the credibility of the witnesses testifying to such facts. This, of course, he could not do. The credibility of the witnesses

and the weight to be given their testimony in this State is entirely within the province of the jury. Then, we have the question as stated in the opinion of the presiding judge sharply presented, because no hypothetical question was put to the witness covering the entire testimony adduced in relation to insanity. The question, then, is as to whether the expert witness can be asked hypothetical questions involving the different theories, without requiring him in one question to pass upon all the testimony adduced. It is conceded by Judge Henderson that, if the testimony is incongruous and contradictory, hypothetical questions can be asked, presenting the different theories, and the witness be required to state his opinion on each. I agree with the presiding judge that this can be done in either event, whether the facts are disputed or not. If this were not true, there would be endless confusion and interminable discussion as to what are the facts, or whether the facts are incongruous or not. That the hypothetical questions may be put to the witnesses in this manner is sustained by the weight of authority, and is the sounder rule. In support of this proposition, I refer to Shirley v. State, 37 Texas Crim. Rep., 476; Jones on Ev., sec. 372, and notes for collated authorities; Stearns v. Field, 90 N. Y., 640; Harnett v. Garvey, 66 N. Y., 641; Mercer v. Vose, 67 N. Y., 56; Fairchild v. Bascomb, 35 Vt., 398; People v. Augsbury, 97 N. Y., 501; Guiterman v. Steamship Co., 83 N. Y., 358; Coyle v. Com., 104 Pa. St., 117; Pidcock v. Potter, 68 Pa. St., 342; State v. Klinger, 46 Mo., 224; State v. Hayden, 51 Vt., 296; Steph. Dig. Ev., p. 105, note. Mr. Jones, in his work on Evidence (section 373), thus states the question: "The facts are generally in dispute, and it is sufficient if the question fairly states such facts as the proof of the examiner tends to establish, and fairly presents his claim or theory. It can not be expected that the interrogatory will include the proofs or theory of the adversary, since this would require a party to assume the truth of that which he generally denies." He is here discussing the practice of putting hypothetical questions. If one side fails to include all the testimony in the hypothetical question, the other may go into the matter fully on cross-examination. This, under all circumstances, will get the matter fairly before the jury; and such a practice is commended by the authorities I have examined on the question. See also Goodwin v. State, 96 Ind., 550; and there are other cases in Indiana to the same effect.

HENDERSON, JUDGE.—I agree to the conclusion reached by a majority of the court in this case, but I disagree as to the rule of practice therein laid down with reference to propounding to an expert a hypothetical case. I do not concede, as contended for by counsel for appellant, that the rule has ever heretofore been laid down by this court. The question was more nearly involved in the case of Webb v. State, 9 Texas Crim. App., 490, than in either the Leache Case or the Williams Case; but an examination of even the Webb Case fails to disclose that the question was properly before the court. Judge White, however, in rendering the opinion in that case, appears to have so conceived it, and discussed the ques-

tion, and stated the rule to be that, in propounding a hypothetical question to an expert on the question of insanity, all the evidence developed on the trial should be embraced in the hypothetical question put to a party's expert witness. The opinion of the presiding judge discusses the matters involved in said cases, and I will no further refer to them, save to suggest that I can not understand how counsel for appellant so strenuously insists in his motion for rehearing that he was misled by the decision in the Williams Case as to the rule laid down in propounding a hypothetical question to an expert, when the Williams Case, at the time the Burt Case was tried, had not then been decided by this court. The question as to the proper interrogatory to be propounded to an expert witness was not before the court in the Williams Case, and what was said on the subject in that case, on a careful reading, would obviously appear to the legal mind to be merely dicta. Besides, as above stated, the Burt Case was tried in the District Court of Travis County on the 27th day of November, 1896, while the Williams Case was not decided by this court until March 27, 1897; so it is absolutely impossible that counsel could have been at all influenced by anything that was said in the Williams Case.

I would here call attention to the case of Shirley v. State, 37 Texas Criminal Reports, 476, decided by this court on the 10th of June, 1896. The opinion in said case would indicate that this very question had come directly before this court in the decision of that case, and the opinion would appear to lay down a different rule than that contended for by appellant. I quote from the opinion as follows: "Upon the trial, counsel for the State submitted to the two physicians, G. B. Beaumont and C. M. Alexander, a hypothetical case. The physicians gave as their opinion that the appellant was not only sane, but that he was feigning insanity. Counsel for appellant objected to this opinion, because the hypothetical case was not full, and did not include the testimony introduced by the appellant tending to show insanity. This objection was not well taken. If not satisfied with the hypothetical case submitted to the doctors by counsel for the State, it was the duty of the counsel for appellant to submit a case made up of all the testimony. Again, the opinion of the doctors was not based upon the testimony that they had heard alone; but they had made examinations of the appellant, had observed his conduct, and the opinion was based upon the evidence delivered by the witnesses and their personal observation of the conduct of the appellant." On an inspection of that record, it will appear, as suggested in the latter part of said opinion, that the experts were examined upon the hypothetical case put, in connection with their personal examination of the appellant and their observation of his conduct. I think it may be said that the question to be propounded to one's expert witness upon a hypothetical case was not fairly involved in the Shirley Case.

After an examination of all the authorities which are accessible, I think the true rule on this subject is simply this: That when the issue of insanity is gone into, and testimony is introduced upon that question, and

an expert is introduced by a party, and a hypothetical question is propounded by such party to such witness, he should embrace in such hypothetical question all the facts that have been developed in the evidence bearing upon that issue which are not incongruous and which are not disputed. If any facts are incongruous or are disputed by him, of course he would be authorized to omit such facts; and, on cross-examination, the opposite party could, if he saw fit, in addition to the hypothetical question put by the party introducing the witness, propound a hypothetical case of his own, and add thereto such other facts as may have been omitted by the opposite party, and which might occur to him to be material. Either party should be authorized to propound hypothetical cases embracing the disputed facts; that is, each party would embrace the facts believed by him to be true which may be disputed by his adversary. Such a course seems to me to be fraught with fairness. See Busw. Insan., sec. 263; Davis v. State, 35 Ind., 496; Goodwin v. State, 96 Ind., 550; Fairchild v. Bascomb, 35 Vt., 398; Hathaway v. Ins. Co., 48 Vt., 335; Steph. Dig. Ev., p. 105, and note. Authorities can, of course, be found to the contrary, and some of them go to the extent of authorizing a hypothetical question to be presented to an expert embracing only such facts as a party desires to present. See Coyle v. Com., 104 Pa. St., 117, and Stearns v. Field, 90 N. Y., 640.

It occurs to me that the rule above stated is not only supported by the best considered authorities, but that it is logical. All of the facts which are adduced in evidence bearing upon the issue of insanity are a part of the defendant's character in that respect. Certainly, all of the undisputed facts pertain to him, and serve to shed light upon his character with respect to his sanity. Now, if the evidence contained a great many facts indicating eccentricity of character, and a few of these are culled out and put to an expert, he might say that they did not necessarily indicate insanity of the defendant; whereas, if all the eccentric facts are presented to the expert, he might say that they clearly indicate insanity. If, moreover, the record embraces a great number of facts, some indicating sanity and others insanity, and the facts indicating insanity alone are presented to an expert, he might say that the party was insane. On the other hand, if only the facts indicating sanity are submitted to the expert, he might unhesitatingly say that the party was sane; whereas, if all the facts in combination are submitted to the expert in the hypothetical question, he might say that they indicated his sanity or insanity, as the case may be. What I mean to say is this: That when all of the facts in evidence bearing upon the issue of the insanity of the defendant are undisputed, and the expert is adduced by the State to respond to a hypothetical question put, that question should, in common fairness, embrace all the facts. This, in concrete form, alone constitutes his character for sanity or insanity, and the opinion based upon all the facts can alone shed any light upon the question or be of any service to the jury. While I believe this to be the correct rule, yet it by no means follows that a case ought to be reversed where this method of propounding a hypothetical case has not been

followed, and I would not be understood as holding that any case ought to be reversed because a proper hypothetical question is not put in the first instance by a party calling an expert, where full opportunity is afforded the opposite party for cross-examining that witness. Much less would I agree that the opposite party may object to a hypothetical question on the ground that it does not embrace all the facts, and conceal from his adversary, or refuse to state for the benefit of his adversary, such facts as are not embraced in the hypothetical question. In the case at bar, full opportunity was afforded the appellant on cross-examination to put a full case to the expert, or to put any character of hypothetical case arising from the evidence which he saw fit; and I do not believe that he could refuse to avail himself of this opportunity, and then ask a reversal of the case because a full hypothetical case had not been put by the State. Further, I do not believe that the bill of exceptions in this case fairly raises this question. The authorities hold that the bill must be so full and certain in its statements that in and of iself it will disclose all that is necessary to emphasize the supposed error. It must sufficiently set out the proceedings and attending circumstances below to enable the appellate court to know certainly that error was committed. The judge must certify to the truth of the facts upon which the exception is predicated; and the taking of an exception, without the recitation of such facts in the certificate of the judge, will not be remedied by the allegation of the grounds upon which the exception was taken. The bill of exceptions must itself certify the ground, or it must reasonably appear from the bill itself.

With regard to the testimony of the witness Carrie Sparks, I think it sufficiently appears that the exclamation she heard was from the wife of the appellant, and was addressed to him. It was made on the evening of the homicide, about 7 o'clock. The evidence shows that the only inmates in said house were the appellant, his wife, two small children, and the nurse. At that particular time the nurse and children were absent, and there is no testimony suggesting that anyone else could have been in the house at the time, save the appellant and his wife. True, the evidence is not positive establishing the fact that it was the voice of the wife addressed to her husband (appellant); but, while it was circumstantial, it was of such a character as to. almost certainly exclude the idea that the expression could have been made by any other party than the wife, or to any other person than her husband. The evidence shows positively the absence of the nurse and children from the house at that hour, and presumptively or inferentially the presence there at that time of appellant and his wife; and I believe it was admissible for the State to show by the witness Carrie Sparks that, as she passed the residence of appellant, she heard a woman's voice exclaim, in a high tone, as if addressing someone, "I will not stand this any longer!" and this could be used by the State for the purpose of showing motive, and directly as tending to suggest sanity.

With the foregoing observations, I agree with the conclusion reached by the court.